[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 22, 2007
THOMAS K. KAHN
CLERK

_____

No. 07-10195

_____

D. C. Docket No. 05-00488-CV-5-WS-WCS

DUSHUN SCARBROUGH,

Plaintiff-Appellant,

versus

BOARD OF TRUSTEES FLORIDA A&M UNIVERSITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(October 22, 2007)**

Before BIRCH, BARKETT and COX, Circuit Judges.

BARKETT, Circuit Judge:

Dushun Scarbrough appeals from a summary judgment in favor of the Board

of Trustees of Florida A&M University ("Florida A&M") on his retaliation claim

filed pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1) and -3(a). We reverse because there are issues of material fact in dispute that must be resolved by a jury.[1]

On summary judgment, we accept all facts in the light most favorable to the non-moving party. Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1242-43 (2001). In this context, the facts indicate that Scarbrough began working for Florida A&M on August 10, 2004, in the School of Nursing as an OPS Academic Advisor for Student Affairs. He was recruited to work for Florida A&M by Kimberly Davis, who was Scarbrough's direct supervisor after he was hired.

Shortly after he was hired, Scarbrough alleges that he was subjected to inappropriate and unwanted sexual advances by Davis which he consistently rejected. On one occasion in September 2004, he was told to meet Davis at her home on a Saturday for a mandatory meeting, at which time Davis made an overt sexual advance. Scarbrough immediately left Davis' home and, as a result, suffered from severe hostility from Davis in the workplace. Specifically, Scarbrough alleges that Davis overloaded him with job duties, including some of

---

[1] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Davis' own responsibilities, and verbally accosted him in the workplace.

Later in September, and throughout the fall semester, Scarbrough spoke separately with Carrie Gavin, an officer in the Florida A&M Equal Opportunity Programs office,[2] and Dean Cornelia Porter, the dean of the School of Nursing, about the incident at Davis' home and the ensuing episodes of hostility and mistreatment. Although Scarbrough spoke with Gavin on a number of occasions during the months from September to December about Davis' harassment, no formal or written complaint was made at that time. Gavin told Scarbrough she would speak to Dean Porter about the circumstances, and Scarbrough himself met with Dean Porter on eight to ten separate occasions throughout the fall semester. Scarbrough told Dean Porter about his problems with Davis, including the meeting at her home in September, and requested that she intervene. Dean Porter told Scarbrough that he was not required to attend meetings at Davis' home and later indicated to him that she had spoken with Davis and her attitude should improve, although it did not.

In October 2004, an opening for a Student Coordinator position was announced in the School of Nursing at Florida A&M. On December 13, 2004,

_____

[2] The Equal Opportunity Programs office at Florida A&M is a non-governmental internal office that is charged with ensuring the university's compliance with the regulations of the federal Equal Employment Opportunity Commission.

Porter interviewed Scarbrough for the Coordinator position and, on December 16, recommended that he be hired for this position.  Then, Dean Porter left for holiday vacation.

On December 22, 2004, Davis confronted Scarbrough in his office, verbally attacked him with abusive and profane language, spit on his face, and knocked papers out of his hands.  Immediately thereafter, on the same day, Scarbrough reported this incident to the Provost's office, from where he was directed to the University Ombudsman, who sent Scarbrough to the Assistant Dean for permission to take the rest of the year off in order to be distanced from Davis.  This permission was granted, and Scarbrough did not return to campus until January 3, 2005.

Upon his return, Scarbrough met with Gavin about the harassment and, specifically, the events of December 22, which he asserted derived from his rejection of Davis' earlier advances.  He also informed Dean Porter of the December 22 confrontation and his subsequent intention to file a formal complaint against Davis with the Equal Opportunity Programs office.  On January 5, Scarbrough filed a formal written sexual harassment complaint against Davis and Florida A&M, and the Provost put Scarbrough under Porter's direct supervision.

Scarbrough's tire was then slashed, and a neighbor reported that a car similar to Davis' had driven away at the time of the incident.  On January 10, Davis, who

4

had become aware of the complaint filed against her, confronted Scarbrough ostensibly about an office telephone bill, used profanity, and threatened him with violence. In response and out of fear for his personal safety, Scarbrough immediately called the campus police and sought an injunction against Davis. A police officer visited Scarbrough in his office, and Scarbrough told the officer that if he were a "woman," the university would have addressed the problem "a long time ago when [the] harassment first began." Scarbrough then went immediately to the county courthouse to get the injunction papers signed and, that same day, gave Porter a copy of the police report and injunction papers. Although Dean Porter had previously recommended Scarbrough for the position of Student Affairs Coordinator in December, she withdrew her recommendation after receiving those papers on January 10 and fired Scarbrough the next day, January 11, for "unprofessionalism."

Florida A&M maintains that Scarbrough's involvement of the police in his dispute with Davis was unnecessarily disruptive and therefore adequate grounds for termination of his employment. Although involving the police[3] in an employment dispute will not always be considered part of the protected conduct that prohibits retaliatory action, where, as here, it allegedly derived from an effort

---

[3] In this case, it was simply the campus police.

5

to protect against actions that are intertwined and interrelated with alleged sexual harassment, it cannot be deemed the "unprofessional" conduct for which an employee can be terminated. Accepting Florida A&M's rationale would, for example, permit the termination of an employee who reported a rape by a supervisor to the police. An employee cannot waive his right to police protection simply because police involvement may be disruptive to the workplace. Cast in the light most favorable to him, Scarbrough's call to the police constituted protected activity under Title VII, as he was threatened and physically accosted as a result of his rejection of Davis' sexual advances, and cannot constitute a legitimate, non-retaliatory basis for termination.

Viewing the facts in the light most favorable to Scarbrough, his alleged "unprofessional" conduct, which, if it consisted solely of complaints of sexual harassment and was at all times found to be inextricably intertwined with his attempt to protect himself from harassment and retaliatory threats of physical violence, cannot constitute a legitimate, non-discriminatory basis for termination. Thus, we find that whether Florida A&M's proffered reason for termination is legitimate and non-discriminatory is a jury question. Accordingly, we vacate the district court's grant of summary judgment in favor of Florida A&M, and we remand this case to the district court for further proceedings consistent with this

opinion.

**VACATED AND REMANDED.**