**F I L E D**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BLAIN PHILLIPS and LISA
PHILLIPS,

      Plaintiffs-Appellants,

v.

BRAD JAMES; SALEM CITY; UTAH
COUNTY; and JAMES ADAMSON,
personal representative of the estate of
Shaun Adamson,

      Defendants-Appellees.

No. 03-4272

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:01-CV-1000-C)**

---

Ryan D. Tenney (Jackson Howard, D. David Lambert, Leslie W. Slaugh, and
Kenneth Parkinson with him on the briefs) of Howard, Lewis & Petersen, P.C.,
Provo, Utah, for Plaintiffs-Appellants.

Kurt M. Frankenburg of Williams & Hunt, Salt Lake City, Utah (Carolyn Stevens
Jensen of Williams & Hunt, with him on the brief for Defendants-Appellees Brad
James and Salem City; Peter Stirba and Gary R. Guelker of Stirba & Associates,
Salt Lake City, Utah, on the brief for Defendants-Appellees), for Defendants-
Appellees.

---

Before **LUCERO**, **McKAY**, and **MURPHY**, Circuit Judges.

**McKAY**, Circuit Judge.

This case began as a call for help. On August 12, 2001, Mr. and Mrs. Phillips had a marital dispute which ended with Mr. Phillips entering his bedroom alone stating, "You started this and I'll finish it." Aplt. App., Vol. I, at 146. Fearing that her husband might hurt himself, Mrs. Phillips called 911. Before speaking with anyone at 911, however, she hung up the telephone because she saw Mr. Phillips leave the bedroom.

A dispatch officer called Mrs. Phillips back. Mrs. Phillips told the officer that the problem was resolved, and that there was no need to send over assistance. The officer informed Mrs. Phillips that it was routine procedure to send an officer to her house and that such procedure would be followed. After Mrs. Phillips hung up the phone this time, Mr. Phillips discerned from the caller ID that 911 had been contacted. He then barricaded himself in his bedroom.

Shortly thereafter, officers arrived from the Salem City Police Department; Mrs. Phillips let the officers into the house so they could discuss the problems that had occurred earlier. As a result of this discussion, the officers learned that Mr. Phillips was upset (according to Mrs. Phillips, she and her husband had been fighting for a few days), that there was a considerable amount of firearms in the house, and that he had threatened to harm himself. The officers attempted to talk

to Mr. Phillips through the bedroom door.

Despite the officers' repeated requests, Mr. Phillips refused to leave the bedroom. To the officers, Mr. Phillips appeared agitated. At one point during their discussion, an officer believed that he heard the sound of shotgun rounds being loaded into a shotgun. Thereafter, in an effort to determine if the door was locked, an officer began to turn the doorknob on the bedroom door. When he saw the doorknob turning, Mr. Phillips exclaimed to the officers that if anybody tried to come through the bedroom door, they would be sorry.

After this exchange, the officers determined that they needed further assistance in assessing the situation and decided to call in the Salem City Police Chief, Brad James ("Chief James"). Chief James asked Mr. Phillips if he could talk to him. Mr. Phillips vehemently denied Chief James' request and told him to leave. In addition, Mr. Phillips threatened Chief James indicating that if his bedroom door moved an inch, he would fire five shotgun shells into the door. Chief James told Mr. Phillips that he would not leave until Mr. Phillips came out of his room and assured them that the situation was nonthreatening. After Mr. Phillips repeatedly failed to comply with his requests, Chief James called the SWAT team.

The SWAT team arrived and set up around the perimeter of the home. Sergeant Shaun Adamson ("Sgt. Adamson"), as part of the SWAT team, set up

post in a tree near the room where Mr. Phillips was located.[1] Lieutenant Scott Carter ("Lt. Carter"), a trained hostage negotiator with the Utah County Sheriff's Department, attempted to contact Mr. Phillips by phone.[2] After several attempts, Lt. Carter finally contacted Mr. Phillips on the phone and, for over an hour, tried to convince him to come of out the house. During the course of the conversation, Mr. Phillips became more and more agitated and made repeated references to his "guns." For example, Mr. Phillips stated, "I got 30 guns, and I got [sic] more ammo. I can hold up in here for an hour." Aplt. App., Vol. III, at 354. He also informed Lt. Carter about his violent history with police officers: "I pulled a gun on a Wasatch County Sheriff and he pissed his pants and I loved to see it. . . . I shoved the gun right up his nose and he pissed his pants." *Id.* at 359. He then warned Lt. Carter not to send any officers into the house: "Yeah, just don't try to come in the house. Just thought I'd tell ya. Come through the back door, 20 gauge is gonna go off; come up to the front door, a 410's gonna go off." *Id.* at 363. When asked whether he had been drinking, Mr. Phillips responded, "Just as much as I can." *Id.* Mr. Phillips again told Mr. Carter what would happen if he

---

[1]Based on his position at the scene, Sgt. Adamson was responsible for the safety of the other officers.

[2]Although the SWAT team members, including Sgt. Adamson, were stationed around the perimeter of the house, they were kept abreast of new information arising from Lt. Carter's conversation via radios that were tuned into a specific police frequency. Aplt. App., Vol. II, at 323.

tried to go inside his home:

> MR. PHILLIPS: There's a gun (inaudible) house. I checked the whole house, nobody's in the house.
> LT. CARTER: Good.
> MR. PHILLIPS: Let the dogs in the house (inaudible) they'll chew whoever comes in the house.
> LT. CARTER: Okay, I see.
> MR. PHILLIPS: Okay. I put a gun (inaudible) that door come own [sic], it goes off. Put a gun on the back door, between – two doors in the back door. . . . Okay. I got a 20 gauge on that one. Anybody opens that door, boom, it goes off. Next door, again, it will go off. My door, I got a 12 gauge, a (Inaudible) 500 Browning automatic five shell, or six counting one in the barrel.

*Id.* at 365-66.

As this conversation continued, Mr. Phillips became convinced that someone had altered the temperature in his house. In an effort to remedy the situation, he left the house. For reasons known only to him, he was armed when he went outside. While outside, the officers repeatedly asked Mr. Phillips to drop his weapon. He refused to comply with their requests. Instead, Mr. Phillips took this opportunity to take note of the officers' location in the surrounding area, looking directly at the officers in the trees, including Sgt. Adamson. Mr. Phillips, still armed, then went back into his house. Inside his room again, Mr. Phillips slid open a window and propped it up with a cup. Sgt. Adamson believed Mr. Phillips was preparing to shoot at the SWAT team through the window.

While Mr. Phillips continued to talk with Lt. Carter, other officers attempted to disconnect the power to Mr. Phillips' residence. Mr. Phillips

-5-

apparently spotted one of the officers and yelled, "hey a\*\*hole, get away from there." *Id.* at 374. Mr. Phillips continued yelling, "Tell those guys in the backyard – the back screens are off so I got a CLEAN shot." *Id.* (emphasis added). Immediately upon hearing of Mr. Phillips' clean shot opportunity, Sgt. Adamson shot Mr. Phillips.

Based on the foregoing events, Mr. Phillips brought suit pursuant to 42 U.S.C. § 1983 against Sgt. Adamson, Chief James, Utah County, and Salem City alleging excessive use of force. Mrs. Phillips joined the suit claiming emotional damages. After protracted litigation, Defendants brought motions for summary judgment. The district court granted Defendants' summary judgment motions concluding that Chief James and Sgt. Adamson were entitled to qualified immunity because Mr. Phillips did not suffer a constitutional injury. Correspondingly, the district court held that their respective employers, Salem City and Utah County were also entitled to summary judgment; dismissal of all the claims hinged on issues addressed by the qualified immunity inquiry. Plaintiffs now appeal and raise the following four issues: (1) whether Mr. Phillips was unreasonably seized, (2) whether the decision to deploy the SWAT team was reasonable, (3) whether it was reasonable for Sgt. Adamson to shoot Mr. Phillips, and (4) whether interview statements of Sgt. Adamson are admissible hearsay.

We review *de novo* the grant of a summary judgment motion based on a qualified immunity defense. *Lawmaster v. Ward*, 125 F.3d 1341, 1346 (10th Cir. 1997). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In the summary judgment setting, when a defendant raises a qualified immunity defense, a heavy two-part burden must be overcome by the plaintiff. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). Plaintiff must first establish that "the facts alleged [taken in the light most favorable to the nonmoving party] show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Medina*, 252 F.3d at 1128. Second, Plaintiff must demonstrate that the right was clearly established. *Id.*

In this case, the district court did not address the second inquiry because it ruled that Plaintiffs had not established the first part of the qualified immunity inquiry that Defendants violated the Phillips' constitutional rights. Aplt. App., Vol. XI, at 1851, 1856; *see also Holland v. Overdorff*, 268 F.3d 1179, 1186 (10th Cir. 2001) (explaining that a plaintiff's failure to establish the first prong is sufficient grounds for granting qualified immunity). The parties' arguments focus this court's attention solely to the first qualified immunity question. Following the parties' lead, we only address whether the officers' conduct violated the

Fourth Amendment. *Saucier*, 533 U.S. at 201.

To be constitutionally permissible, an officer's use of force must be reasonable, which is measured "from the perspective of a reasonable officer on the scene," recognizing that officers are sometimes "forced to make split-second judgments" in uncertain and dangerous circumstances. *Graham v. Connor*, 490 U.S. 386, 395, 396-97 (1989). What may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time. *Id.* at 396.

In making the reasonableness determination, we must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks omitted). There is not a precise formula to apply, but relevant factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* As with all reasonableness inquiries, the touchstone is the totality of the circumstances. *Id.*

We first note that neither party takes issue with the district court's assumption that Defendants seized Mr. Phillips. Neither will we. *See Foote v. Spiegel*, 118 F.3d 1416, 1422 (10th Cir. 1997) (explaining that we only have jurisdiction to address issues raised in the notice of appeal). Plaintiffs' first

contention is that the seizure was unreasonable at its inception in light of Mr. Phillips' assurances to the officers through the bedroom door that he was alright. The district court concluded that the officers' desire to personally observe Mr. Phillips before leaving the premises was reasonable considering:

> (1) Mr. Phillips' irrational response to the officers' requests that he come out of his bedroom; (2) Mr. Phillips' decision to barricade himself in his bedroom, where he had weapons and ammunition; (3) Ms. Phillips' statement that Mr. Phillips was on antidepressant medication; (4) Mrs. Phillips expressed concern that Mr. Phillips would hurt himself; and (5) the officers' knowledge that Mr. Phillips had been drinking.

Aplt. App., Vol. XI, at 1848. Plaintiffs claim that each of these facts is disputed, rendering summary judgment inappropriate. After thoroughly reviewing Plaintiffs' contentions, we disagree.

Other than disagreeing with the adjective used to describe Mr. Phillips' initial response, "irrational," Plaintiffs do not dispute the fact that Mr. Phillips chose not to exit his bedroom and talk with the officers when they requested that he do so. Neither do they dispute that the officers heard a noise come from Mr. Phillips' bedroom, what they believed to be the chambering of a shotgun shell.[3] These, and other, responses to the officers' requests are both relevant to the analysis and not disputed.

_____

[3]The fact that Mrs. Phillips did not hear this chambering is insufficient to create a genuine issue because she was not in the same location as the officers when this allegedly took place.

Plaintiffs also failed to cite to record evidence contradictory to the clear evidence that Defendant barricaded himself in his room. Plaintiffs instead argue that it was not illegal for him to do so. The legality of Mr. Phillips' actions is irrelevant to our inquiry. There is not a genuine issue of fact as to whether Mr. Phillips barricaded himself in his room.

Although we disagree with Plaintiffs that Mr. Phillips' use of antidepressant medication is somehow not part of the totality of the circumstances we are to consider in a reasonableness inquiry, we agree that the only factors that can reasonably be considered are those known to the officers prior to making the disputed decision (i.e., to seize a person, to use force, etc.). However, Plaintiffs do not direct us to the location in the voluminous record where we can find support for their proposition that Defendants did not know about Mr. Phillips' use of antidepressants before they seized him. Absent such, we will not sift through the record to find support for this argument. *SEC v. Thomas*, 965 F.2d 825, 827 (10th Cir. 1992). In light of this omission, we do not consider this issue. *See* 10th Cir. R. 28.2(C)(1). Therefore, for purposes of this appeal, we cannot say that the district court erred in considering Mr. Phillips' use of antidepressant medication as part of the totality of the circumstances presented to the officers in deciding to seize Mr. Phillips.

Turning to the alleged factual dispute over Mrs. Phillips' comments that

she feared for her husband's safety, Mrs. Phillips argues that her subsequent recanting of her original call and later claims are sufficient to demonstrate a genuine issue. We note that Mrs. Phillips first expressed concern about the situation as a whole when she dialed 911. The fact that she told the officers thereafter that everything was okay does not alter the initial fact that something was amiss between Mr. and Mrs. Phillips sufficient for her to call for help. There are a number of reasons why someone in Mrs. Phillips' shoes would say, after initially dialing 911 and later when the officers arrived, that the situation was resolved. Numerous circumstances could have made her change her story (threats could have been made, weapons drawn, etc.). That is why we give great latitude to police officers when presented with domestic disturbance scenarios. *See Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 124 S. Ct. 2451, 2458 (2004). In further support of this fact, Mrs. Phillips stated that, prior to entering his room alone, Mr. Phillips stated, "You started this and I'll finish it." Aplt. App., Vol. I, at 146. That Mrs. Phillips expressed concern about Mr. Phillips' safety is not in dispute.

Finally, Plaintiffs allege a factual dispute exists surrounding the officer's knowledge about Mr. Phillips' alcohol consumption. To support this argument, Plaintiffs refer the court to Mr. Phillips' deposition testimony wherein he states that he did not begin drinking until after the officers arrived. Aplt. App., Vol. II,

at 197. This evidence is insufficient to demonstrate a genuine issue of material fact as to the officers' knowledge. When he began drinking and whether he began drinking is irrelevant. We are only concerned with what the officers knew, which is based on what Mr. Phillips told the officers, not with what he actually did.

Plaintiffs have failed to counter the factual assertions proffered by Defendants to demonstrate a genuine issue of material fact. Therefore, despite belief that material facts are in dispute, the district court did not err in concluding that the initial seizure of Mr. Phillips was reasonable.

Plaintiffs next contend that Chief James' decision to employ the assistance of the SWAT team rendered the seizure unreasonable. Each decision made by the officers that changes the circumstances during Mr. Phillips' seizure is subject to "reasonableness" scrutiny. *See Holland*, 268 F.3d at 1193. We have previously noted that the decision to deploy a SWAT team can, in certain situations, involve "an overwhelming show of force – force far greater than that normally applied in police encounters with citizens." *Id.* at 1190. Our decision in *Holland* addressed the "decision to employ a SWAT team to make an arrest on a misdemeanor warrant and to conduct a search of a residence." *Id.* at 1189. We are presented with a very different situation in this case. *Holland* is therefore inapposite.

In this case, the SWAT team was not requested to execute an arrest of Mr. Phillips or to search his residence; the SWAT team in this instance was called in

as back up and performed the more passive role of securing the perimeter. It is important to note that the initial purpose for which the officers came to Mr. Phillips' house was based on Mrs. Phillips' 911 call related to an apparent domestic disturbance. The Supreme Court has commented on the latitude given to police officers in responding to domestic-disturbance calls: "Officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Hiibel*, 124 S. Ct. at 2458.

In this case, while attempting to "assess the situation," Officer Dibble learned from Mrs. Phillips that her husband was barricaded in a room filled with weapons and that he had threatened to hurt himself. In talking with Mr. Phillips, Officer Dibble also thought he heard Mr. Phillips chamber a shotgun shell. Chief James was called in to assess the situation. When he checked to see if the door was locked, Mr. Phillips threatened to fire five shotgun shells into the door, which was directly in front of Chief James. Armed with this information, coupled with the violent threats made by Mr. Phillips and his clearly unstable condition, Chief James was not unreasonable in requesting the passive assistance of the SWAT team.

Finally, we address Plaintiffs' argument that Sgt. Adamson's use of deadly

-13-

force violated the Fourth Amendment.[4]  Specifically, Plaintiffs argue that Sgt. Adamson's decision to shoot Mr. Phillips was unreasonable.  The use of deadly force is justified under the Fourth Amendment "if a reasonable officer in the Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."  *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).  Again, this determination turns on the totality of the circumstances.  *Graham*, 490 U.S. at 396.  Critical ingredients in the totality of the circumstances' inquiry in this case include "whether the officers were in danger at the precise moment that they used force and . . . whether Defendants' own reckless or deliberate conduct [footnote omitted] during the seizure unreasonably created the need to use such force."  *Sevier*, 60 F.3d at 699.

Plaintiffs' argument relies heavily on the "precise moment" factor. Specifically, Plaintiffs argue that Sgt. Adamson was not in danger of serious bodily injury immediately prior to the time when he shot Mr. Phillips.  Strict reliance on just one factor when the totality must be considered is inappropriate.

---

[4]We do not address Plaintiffs' "evidentiary issue" because consideration of that issue would not affect the ultimate outcome of this appeal. *See Griffin v. Davies*, 929 F.2d 550, 554 (10th Cir. 1991) (The court "will not undertake to decide issues that do not affect the outcome of a dispute."); *see also United States v. Torres*, 182 F.3d 1156, 1164 n.2 (10th Cir. 1999) ("[P]rinciples of judicial restraint" require us not to issue "an opinion that is unnecessary and meaningless as applied to the [parties] in this case.").

*See Florida v. Bostick*, 501 U.S. 429, 437 (1991). In addition, although the precise moment before Sgt. Adamson shot is a critical factor, the events leading up to that moment are also extremely relevant. When considered in the totality of the circumstances, Sgt. Adamson's decision to shoot Mr. Phillips was not unreasonable.

In addition to the circumstances noted above, the situation presented to Sgt. Adamson had escalated considerably from the point when Chief James requested the assistance of the SWAT team. When the SWAT team arrived, Lt. Carter, the hostage negotiator, spoke with Mr. Phillips for over an hour. SWAT team members learned of the status of these negotiations by radio. They learned that "Mr. Phillips (1) was acting aggressively, (2) possessed a number of firearms that were located in the residence, including a high powered rifle, (3) had stated that he was willing to wait things out for however long they took, (4) had stated he was agitated by the number of law enforcement personnel surrounding the residence, (5) was possibly intoxicated, and (6) had stated he would shoot any officers who tried to remove him from the home." Aplt. App., Vol. II, at 323; Vol. III, at 378-79.

In addition, SWAT team members also personally saw Mr. Phillips exit his home carrying a handgun. Mr. Phillips repeatedly refused to cooperate with the officers when they requested that he put down his weapon. *Id.*, Vol. II., at 324;

Vol. III, at 379. Instead, Mr. Phillips looked directly at Sgt. Adamson who was positioned in the tree. *Id.*, Vol. III, at 379. After he went back inside his house, Mr. Phillips opened a small window and propped it up with a cup. *Id.* at 379. Mr. Phillips then threatened officers who were attempting to shut off the power to his house: "Hey, a**holes, get away from there . . . I'm gonna shoot his f***ing arm off." *Id.*, Vol, II, at 324; Vol. III, at 380. Mr. Phillips then knocked the screen out of the small window, and an officer thought he saw him holding a gun in his other hand. *Id.*, Vol. III, at 380. Mr. Phillips yelled through the window that he could "take somebody's arm off" and that "the back screen[ was] off so [he had] a CLEAN shot." *Id.* (emphasis in original). Immediately after exclaiming that he had a CLEAN shot, Sgt. Adamson shot Mr. Phillips.

The situation presented to Officer Adamson was clearly a tense, uncertain, and rapidly evolving situation that we do not like to second-guess using the 20/20 hindsight found in the comfort of a judge's chambers. *See Graham*, 490 U.S. 386, 396-97. There was no reason for Sgt. Adamson to have to wait to be shot at or even to see Mr. Phillips raise a gun and point it at him before it would be reasonable for him, under these circumstances, to shoot Mr. Phillips. From the beginning Mr. Phillips' actions were unreasonable. He had the power to defuse the situation by coming out of his bedroom and talking to the officers to allow

them to reasonably assess the situation.[5] The officers' requests for him to do so were certainly reasonable. *See Hiibel*, 124 S. Ct. at 2458. He repeatedly refused to do so. Mr. Phillips made the situation worse by continually threatening the officers with a high degree of physical force as they attempted to perform their job in a reasonable manner.

This conduct coupled with the increasing threats of violence gave Sgt. Adamson probable cause to believe that he was being threatened with serious bodily harm. *See Sevier*, 60 F.3d at 699. Therefore, Sgt. Adamson acted reasonably in shooting Mr. Phillips.

For the foregoing reasons, we agree with the district court that the officers were reasonable in their treatment of Mr. Phillips and, therefore, Plaintiffs could not establish a violation of their constitutional rights rendering summary judgment proper.

**AFFIRMED**.

---

[5]Although Mr. Phillips was willing to talk to some extent with the officers through his bedroom door, the officers were reasonable, as discussed above, in their insistence that they communicate face-to-face in order to appropriately assess the situation in light of the purpose for which they were there. *See Hiibel*, 124 S. Ct. at 2458 (recognizing the wide latitude officers have in responding to domestic disturbance calls).