**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 24, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

DONALD FRANCIS KING,

        Plaintiff - Appellee,

v.

LAMONT HILL,

        Defendant - Appellant,

and

TULSA COUNTY SHERIFF'S
DEPARTMENT; STANLEY GLANZ, in
his official capacity as Sheriff of Tulsa
County; ALLEN GOODSON; BRIAN
WALKER; BOARD OF COUNTY
COMMISSIONERS OF TULSA
COUNTY,

        Defendants.

No. 14-5073
(D.C. No. 4:12-CV-00137-JED-TLW)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **LUCERO** and **MATHESON**, Circuit Judges.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Lamont Hill, a deputy sheriff with the Tulsa County Sheriff's Department, shot and wounded plaintiff Donald Francis King during a domestic disturbance call. Mr. King sued Deputy Hill under 42 U.S.C. § 1983, complaining that Deputy Hill had used excessive force in violation of the Fourth Amendment. The district court denied Deputy Hill's motion for summary judgment based on qualified immunity, and he appeals. We affirm the denial of summary judgment.

## I. BACKGROUND

In this qualified immunity appeal we "take, as given, the facts that the district court assumed when it denied summary judgment." *Johnson v. Jones*, 515 U.S. 304, 319 (1995). The district court summarized the facts as follows:

> On December 1, 2010, King's step daughter, Kasey Apple, called 911. Apple reported to the 911 dispatcher that her mother, Sherral Dalton, had reported to Apple by phone that King (Dalton's husband) was making threats and had broken a water line at the home where Dalton and King lived on Iroquois Avenue. Apple reported that King is bipolar and was "off his meds." In response to the dispatcher's questions, Apple reported multiple times that there were no known weapons in the Iroquois Avenue house.
>
> Immediately after Apple's call to 911, at 3:31 p.m., a "domestic disturbance" dispatch call went out to the Tulsa County Sheriff's Office (TCSO) to respond to the Iroquois Avenue home. The dispatch call stated that King had broken a water line at the house, was threatening to harm a horse, "there are no known weapons" at the location, and that King was "10-85." Upon hearing the dispatch call, Deputy Lamont Hill instructed his trainee, Allen Goodson, to respond on the radio that they would take the call, with Deputy Brian Walker also responding. The three TCSO deputies proceeded to the Iroquois Avenue location, with Hill and Goodson in one vehicle and Walker in another. All three of the deputies understood that the dispatcher's radio report of "10-85" meant that King was mentally ill. Upon arrival near the Iroquois Avenue

- 2 -

house, Hill encountered Sherral Dalton (King's wife), who was standing in the driveway to the home of a neighbor, Richard Harmon, Jr. Hill spoke to Dalton for about 15 or 20 seconds, and Dalton informed Hill that King had not hit or otherwise physically injured her. The deputies then drove toward the house where King was located.

Deputy Walker parked in front of the property, blocking the long driveway leading to the house. Walker and Goodson positioned themselves closer to talk to King, approximately 25 to 30 yards from King, while Hill stayed back at a distance of 65 to 75 yards. The testimony conflicts as to where, specifically, King was located when the deputies drove up to the property. Hill testified that King "ran" and "bolted for the house," while Deputy Walker and another witness testified that King was walking toward the house from his yard.

The record contains varying versions of what happened next. At some point, King was standing in the doorway of the home or just outside on the step leading out from the home, and it appeared to some witnesses that he was holding something. King was wearing a camouflage jacket, and was holding or carrying another camouflage jacket. The deputies assert that the second jacket was draped over both of King's arms and that the deputies believed that King could have had a "long gun" under that jacket. Neighbor Harmon testified that he could see both of King's hands and King did not have anything in his hands. Another neighbor, Chester Jones Jr., testified that it was clear that King did not have anything in his hands, although he did have a coat, which was folded and draped over King's left arm. Jones testified that it was *not* possible that King had a long gun under that coat:

> Q. Mr. Jones, could [King] have possibly had a long gun under that coat?
>
> A. No. No. I own four long guns, and I couldn't - - no. It'd've been sticking way out like this (indicating) or - - couldn't - - couldn't hold a long gun, not. . . You can't hold a long gun like this (indicating).

Deputy Hill went to the trunk of his vehicle and retrieved his AR-15 rifle, inserted a magazine in the rifle, and trained his rifle on King.

According to Jones, after Hill got his rifle out of his car and inserted a clip, Hill told Jones "Go back in the house, dog" and then "I thought I told you, go back in the house, dog. You don't want to see this."[1]

According to some witnesses (including Deputy Walker), Walker asked King to come out to talk. Walker testified that he told King to "put down whatever he had in his hands and that we just needed to talk." In response, King shouted at the deputies to "get back," "get off my property," or "get the fuck off the property." Some witnesses stated that King said that he had black powder, while others provided statements that King indicated that he had black powder "in the house." Hill asserts that King threatened to "blow you-all's asses up," while Walker testified that King said "I've got enough explosives to blow this place up. I'll - - you don't know if I'll do it. Get off my property."

According to Deputy Hill's deposition testimony, immediately before he fired his rifle, King "raised his hands up closer to his face from his middle of the chest area up here and said, 'that's it, mother fuckers,'" and Hill then fired multiple rounds from his AR-15 rifle. In contrast, at a TCSO Critical Incident Review Board hearing, Hill stated that, immediately before he shot him, King yelled "Get on the fucking ground right now. I'm going to kill you right now." Hill did not report that King threatened to shoot the deputies:

Q. So was he also threatening to shoot you?

A. That I don't know.

Deputy Walker testified that, immediately before the shooting, King took a step toward him and Walker continued to yell at him to put down whatever he had in his hands. Neighbor Harmon testified that King was not making any threatening motions toward the deputies, but was just standing there in the doorway of the house. Harmon testified that one deputy yelled at King to show his hands, and King responded by starting to raise his hands, which he did in a manner that was not threatening. Some witnesses testified that King was off the porch, in

---

[1] [district court's footnote 1:] After neighbor Jones went inside the house (in response to Deputy Hill's directives), he told his wife "Man, they're going to kill Don [King]. Don ain't got no gun. He – he – he going to get killed out there messing around."

the yard, when he was shot, while others testified that King was on the steps immediately adjacent to the front door when he was shot and then he fell off the steps after he was hit with the gunfire.

After firing the first shot, Hill did not think King was hit, because King "started to hunker down" to make himself smaller and more difficult to hit.[2] Hill rapidly fired two or three more shots at King. One of the shots hit King in the side, seriously injuring King and causing extensive internal injuries.

In his deposition, Hill testified that he shot King because he was in fear for himself and the other deputies, but his statement to the Review Board again differed. There, Hill reported that he did not believe King was aware of what Hill was doing, and said, "I really don't think [King] saw me, to tell you the truth." [Hill's] statement to the Review Board indicated that he was *not* afraid for himself, but he didn't want anything to happen to the other deputies. Neither of the two deputies standing much closer to King fired their weapons at King, but those deputies testified that they had their weapons ready to fire. A witness, Lemuel Ray Sayre, testified that, after he heard the shots, he heard a deputy ask "What'd you do that for? What'd you do that for?" According to Sayre, the deputy asking that question was the deputy who had just been trying to talk to King. Immediately after the shooting, deputies hand-cuffed King, then dragged or moved King across the yard to be transported to a hospital by ambulance. King was unarmed at the time of the shooting, and no weapons were found in his possession.

Aplt. App., Vol. II at 561-65.

The district court denied qualified immunity because "[a]t the time Hill shot King, the law was clearly established that a law enforcement officer may not use deadly force to seize an unarmed person who is not posing any threat to the officer or others." *Id.* at 573.

---

[2] [district court's footnote 2:] In a prior statement to the Review Board, Hill testified that, after the first shot, King still had his hands up rather than starting to "hunker down" to make himself smaller.

## II. DISCUSSION

### A. *Jurisdiction and Standard of Review*

This court has jurisdiction to review "all final decisions of the district courts of the United States." 28 U.S.C. § 1291. "Ordinarily, orders denying summary judgment do not qualify as final decisions subject to appeal." *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011) (internal quotation marks omitted). But because qualified immunity provides a right to avoid trial, "a district court's decision denying a government official qualified immunity is an immediately appealable final collateral order." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1108 (10th Cir. 2008).

This right to appeal, however, is limited to "purely legal issue[s]" raised by the denial of qualified immunity. *Johnson*, 515 U.S. at 313. Thus, a defendant may not appeal the district court's determination "that factual issues genuinely in dispute preclude summary adjudication." *Ortiz*, 562 U.S. at 188. But a determination that the plaintiff's version of the facts suffices to show a constitutional violation is immediately appealable, *Lynch v. Barrett*, 703 F.3d 1153, 1159 (10th Cir. 2013), as is "[a] determination that the law allegedly violated by the defendant was clearly established at the time of the challenged actions," *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013) (internal quotation marks omitted).

Notwithstanding these limitations on our appellate review, Deputy Hill repeatedly takes issue with the district court's statement of facts. He asks us to view the facts differently than the district court did. As explained above, we cannot do

that.  *See also Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) ("[I]f a district court concludes a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own de novo review of the record might suggest otherwise as a matter of law.").  We thus confine our review to Deputy Hill's issues of law, reviewing the district court's qualified immunity determinations de novo and viewing the evidence in the light most favorable to the plaintiff as the nonmoving party.  *Felders v. Malcom*, 755 F.3d 870, 877 (10th Cir. 2014).

## B.  *Qualified Immunity*

### 1.  **Constitutional Violation**

#### a.  *Legal background*

Excessive force claims are evaluated using the Fourth Amendment's standard of objective reasonableness, which is judged from the perspective of a reasonable officer on the scene.  *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).  "Because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."  *Saucier v. Katz*, 533 U.S. 194, 205 (2001) (citation and internal quotation marks omitted), *receded from on other grounds*, *Pearson v. Callahan*, 555 U.S. 223, 235-43 (2009).  "What may later appear to be unnecessary when reviewed from the comfort of a

judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time." *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005).

"The use of deadly force is justified under the Fourth Amendment if a reasonable officer in the Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Id.* at 1083 (internal quotation marks omitted).[3] The totality of the circumstances should be considered when evaluating an excessive force claim. *Id.* In evaluating the totality of the circumstances, we examine three factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *See Graham*, 490 U.S. at 396; *see also Jiron v. City of Lakewood*, 392 F.3d 410, 414-15 (10th Cir. 2004) (listing *Graham* factors). The officers are not required to be correct in their assessment of the danger presented by the situation; it is only required that their assessment be objectively reasonable. *Jiron*, 392 F.3d at 415; *see also Saucier*, 533 U.S. at 205 ("If the officer's mistake as to [whether a particular amount of force is legal] is reasonable . . . the officer is entitled to the immunity defense.").

---

[3] Deputy Hill used "deadly force," though Mr. King survived the shooting. Deadly force includes "force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily harm," including "[p]urposefully firing a firearm in the direction of another person." *Jiron v. City of Lakewood*, 392 F.3d 410, 415 n.2 (10th Cir. 2004) (internal quotation marks omitted).

b. *Analysis*

    i.    <u>Severity of Crime</u>

The district court determined that any crime the officers were investigating

was not particularly serious, given that Ms. Dalton had advised Deputy Hill that Mr.

King had not harmed her and that Deputy Hill testified he did not think there would

be an arrest when the officers drove up to the house. Deputy Hill emphasizes Mr.

King's history of violent behavior; that he had broken a water line and was trying to

hurt a horse, and his agitated, uncooperative; and threatening behavior after officers

arrived. He also notes that Mr. King was later convicted of "Threatening a Violent

Act" for his conduct during the shooting incident.

These facts, however, do not show the officers were investigating a serious

crime. Deputy Hill was advised of Mr. King's violent behavior at the house and still

did not initially plan to arrest him. Also, Mr. King's subsequent conviction was for a

misdemeanor, to which he pleaded "no contest" and received a suspended sentence.

Aplt. App., Vol. I at 222.[4]

  <u>Seriousness of Threat</u>

Deputy Hill emphasizes that the seriousness of the threat must be evaluated

from his perspective as a reasonable police officer rather than from the perspective of

---

[4] The district court did not mention Mr. King's conviction in its statement of the facts. Under an approach that strictly avoids departing from the facts the district court found, we would not consider it, either. But because the conviction is undisputed, and could therefore be considered part of either party's version of the facts, we mention it here to show that it does not affect the outcome.

witnesses on the scene or from facts discerned in hindsight. Although the district court cited perceptions and actions of non-police witnesses, it correctly evaluated the seriousness of the threat from the perspective of a reasonable officer in Deputy Hill's circumstances.

A reasonable officer would not have shot Mr. King unless he had a reasonable belief that Mr. King posed an immediate threat justifying the use of deadly force. Deputy Hill's justification for shooting Mr. King was that he reasonably believed Mr. King was armed with a long gun, which, it turned out, he was not.[5] The facts, considered in the light most favorable to Mr. King, and reasonable inferences therefrom, do not support Deputy Hill's justification. Aplt. App., Vol. 2 at 570-71 ("The evidence and reasonable inferences, when viewed in favor of [Mr.] King, would establish that . . . [he] was unarmed at the time of [the] shooting; both of his hands were visible; [and] he could not have been holding a long gun"); *see Walker v. City of Orem*, 451 F.3d 1139, 1160-61 (10th Cir. 2006) (rejecting officers' contentions that they reasonably believed suspect was armed before shooting him, and affirming denial of qualified immunity to officers).

---

[5] In his brief, Deputy Hill repeatedly states or implies that Mr. King was armed during the incident. *See, e.g.*, Aplt. Opening Br. at 47 ("[T]he [district court] erred in its acceptance of the unsupported fact that King was unarmed at the time of the incident."). But the record unequivocally supports the district court's statement that he was unarmed. *See, e.g.*, Deputy Hill's Statement of Uncontroverted Facts, ¶ 49, Aplt. App., Vol. I at 43 ("No weapon was found in Plaintiff's possession.").

Deputy Hill contends various facts show that Mr. King posed an immediate threat to the officers.  *See* Aplt. Opening Br. at 34-35.  But he presents these facts in the light most favorable to himself.  He ignores many facts and inferences favorable to Mr. King, the non-movant.  Supreme Court precedent forbids this approach on summary judgment motions, including those involving qualified immunity.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014).

The district court cited particular facts showing the lack of an immediate threat, including that "the officers were informed that . . . there were no known weapons in the house; King was unarmed at the time of shooting; both of his hands were visible; he could not have been holding a long gun; and any threats King made about black powder in the house did not pose any immediate threat to the deputies" because of their distance from him and from the house.  Aplt. App., Vol. II at 570-71.  Deputy Hill disputes many of these facts, but such factual disputes are not before us because, as explained above, our interlocutory jurisdiction extends only to questions of law.

The district court noted that in assessing a threat that a suspect poses to police officers, courts consider such factors as "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir.

2008).  Although Mr. King had no weapon, the district court evaluated these factors in light of Deputy Hill's belief that he did.

A reasonable jury could find in light of these factors that Mr. King did not pose an immediate threat to the officers or others.  As noted above, the evidence considered in the light most favorable to Mr. King does not support Deputy Hill's justification for the use of deadly force—that he reasonably believed Mr. King was armed with a long gun.  Mr. King could not have dropped a weapon he did not have.  At least one witness said that Mr. King raised his hands in a non-threatening manner in response to police commands, and at the time he was shot Mr. King was not making any threatening motions towards the officers.  The officers were between 25 and 75 yards away from Mr. King, which "would certainly impact the reasonableness of any perceived threat from an unarmed man."  Aplt. App., Vol. II at 570.  Finally, the manifestation of Mr. King's intentions, as expressed by his verbal threats, must be considered in light of the likelihood that he was unable, as an unarmed suspect standing at a significant distance from the officers, to harm them or others.

ii.    Active Resistance to Arrest

The third factor, whether Mr. King was actively resisting arrest, is less relevant.  Deputy Hill argues that Mr. King resisted the officers' commands to raise his hands, but the extent of his compliance is disputed.

\*    \*    \*    \*

- 12 -

In sum, the district court properly determined, applying the *Graham* factors, that Mr. King's version of the facts showed unreasonable application of deadly force, thus establishing a constitutional violation as a matter of law.

2. **Clearly Established Law**

a. *Legal background*

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks omitted). Thus, an officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

Because the reasonableness inquiry in an excessive-force case is fact-specific, *see id.*, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate," *Ashcroft*, 131 S. Ct. at 2083. Courts should not define clearly established law "at a high level of generality," but should focus on whether "the violative nature of particular conduct" was so clearly established that it put the officer on notice of the unconstitutionality of his actions. *Id.* at 2084. For a right to be "clearly established," there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or "the

- 13 -

clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (internal quotation marks omitted).

b. *Analysis*

As noted, the district court determined that "[a]t the time Hill shot King, the law was clearly established that a law enforcement officer may not use deadly force to seize an unarmed person who is not posing any threat to the officer or others." Aplt. App., Vol. II at 573. This formulation of the right meets the clearly established test by avoiding generalities in favor of a right tailored to the essential facts of this case. We next ask whether the right, as the district court articulated it, accurately reflects clearly established law. It does.

The Supreme Court said in *Tennessee v. Garner*, 471 U.S. 1 (1985), that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id*. at 11. *Garner*, which involved a fleeing suspect rather than a defiant and threatening one, does not alone clearly establish the law applicable to the circumstances of this case. But it supplies a foundational principle concerning the limits on the use of deadly force against unarmed suspects.

The specific right at issue in this case most clearly finds support in *Zuchel v. Spinharney*, 890 F.2d 273 (10th Cir. 1989). In *Zuchel*, the suspect, a homeless man, created a disturbance at a restaurant by kicking the front door and cracking its glass. He then left the restaurant and passed a group of teenagers on bicycles, exchanging

heated words with them.  The suspect withdrew something from his pocket; the teenagers believed it was a pocket knife.  As police officers approached the scene, one or more of the teenagers yelled to the officers that the suspect had a knife.  The officers testified that the suspect then moved toward the defendant officer, making threats to kill one of the teenagers, cursing the officer, and telling him "you'll have to kill me."  *Id.* at 275.

As in this case, there was conflicting testimony in *Zuchel* concerning what provoked the shooting.  Witnesses who supported the defendant officer's version of events claimed he told the suspect to drop the "knife" at least three times, but the suspect continued to come forward, jabbing at him in a threatening way.  At least one witness supported this view of threat to the officer, stating the defendant held his fire until the suspect was three and one-half feet away.  Another witness, however, estimated the distance at ten to twelve feet and stated the suspect was neither charging the officer nor stabbing at him, but was instead trying to explain himself.  Other witnesses stated they could not see any weapon in the suspect's hand, and maintained that the officer told the suspect to "shut up or you're going to die."  *Id.*  Some witnesses said they heard no warning from any of the officers, and at least one witness stated the defendant officer fired as fast as he could pull the trigger.

The defendant officer shot the suspect four times, killing him.  It turned out the suspect was "armed" only with a pair of fingernail clippers.  Under the circumstances, this court held that "this record contains sufficient evidence which, if

believed by a trier of fact, could support a finding that [the defendant officer's] conduct was not objectively reasonable." *Id.* at 276. As in this case, there was conflicting testimony concerning the suspect's actions and whether he appeared to be armed. Even though it was possible the officer was mistaken about the nature of the threat rather than deliberately malicious, we upheld the denial of qualified immunity on summary judgment.

Other circuit cases that clearly established the right in question before Deputy Hill shot Mr. King include *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150 (10th Cir. 2010), and *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006). In *Zia*, officers were called to a residence to deal with a dispute between the caller and his adult son. Dispatch informed the officers that the son had mental health issues and that there were firearms present at the residence. The defendant officer exited his vehicle with his weapon already drawn and did not identify himself as a police officer. He observed the suspect sitting in the driver's seat of a van that was stuck on a pile of rocks on the side of the driveway. The officer stood in front of the van, at an angle. There were disputed facts about how far away he was, but the distance was somewhere between one foot and fifteen feet away. The wheels of the van allegedly were pointed towards the officer, though there was some doubt about whether he could see them. As another officer approached the van from the driver's side yelling for the suspect to exit the vehicle, the van—though still stuck on the rocks—jumped

forward about a foot. The defendant officer then fired a single shot into the van, hitting the suspect in the neck. The suspect later died from his injuries.

This court affirmed the denial of qualified immunity. The court explained that "[a]lthough we have never laid down a *per se* rule regarding distance, we cannot say that a van fifteen feet away, which according to the plaintiffs was clearly stuck on a pile of rocks, gave [the defendant] probable cause to believe that there was a threat of serious physical harm to himself or others." *Id.* at 1155. The court reached this conclusion even though the van had allegedly lurched toward the defendant officer. As in this case, under the plaintiff's version of events, a reasonable jury could find that the officer's use of force was not objectively reasonable.

In *Walker*, officers shot a suicidal suspect who was holding a knife to his left wrist. The first officer opened fire because, he contended, he reasonably believed the suspect was holding a gun. After the first officer's bullet entered the suspect's body and caused him to stagger, the second officer believed the suspect was swinging toward him in a "classic pistol shooting stance." 451 F.3d at 1158. So he, too, opened fire, hitting the suspect with two more rounds to the chest. As in this case, the officers claimed they acted under a high-pressure situation under a reasonable belief that the defendant posed a threat to them. But this court affirmed the denial of qualified immunity, stating that the plaintiff's version of events

> suggests that [the first] Officer . . . acted precipitously in shooting [the suspect], who posed a danger only to himself. The crimes at issue (theft of the vehicle, eluding the officers) were not particularly severe. [The suspect] did not pose an immediate threat to the safety of the officers or

- 17 -

others.  He had made no threats and was not advancing on anyone with the small knife.  He was holding the knife to his own wrist.  While [the first] Officer . . . stated that he believed [the suspect] was pointing a gun at him, this belief was not reasonable, if plaintiff's version of events is accepted, and she is given the benefit of every reasonable inference.  The angle of [the suspect's] hands and the amount of light on the scene should have permitted [the first] Officer . . . to ascertain that he was not holding a gun in a shooting stance.  Finally, [the suspect] was not actively resisting arrest, and there was no need to use deadly force to prevent him from fleeing and possibly harming others.

*Id.* at 1160.

As to the second officer's decision to shoot, this court noted that

[a]t the time he fired at [the suspect], [the second officer] was behind the cover of his vehicle, fifty-eight feet away from [him].  [The suspect] was not advancing on him and had not threatened him in any way, other than allegedly pointing his hands in [the second officer's] direction in what [he] interpreted as a "classic shooting stance."  [The second officer] had not seen a gun in [the suspect's] hands.  Whether he reasonably believed from the shots he heard, and the fact that [the first officer] had ducked behind the Subaru, and the position of [the suspect's] body and hands, that he or others were in danger from [the suspect], is a factual question that remains to be resolved.

*Id.* at 1160-61.

We conclude that, taken together, *Garner*, *Zuchel*, *Zia*, and *Walker* clearly establish that a reasonable officer in Deputy Hill's circumstances would have understood that shooting Mr. King was unconstitutional deadly force in violation of the Fourth Amendment.  The district court therefore correctly denied Deputy Hill's motion for summary judgment on the issue of qualified immunity.

### III. **CONCLUSION**

The facts, taken in the light most favorable to Mr. King, establish a violation of his constitutional rights.  And, at the time Deputy Hill shot Mr. King, the law was

clearly established that an officer could not shoot an unarmed man who did not pose any actual threat to the officer or to others. We therefore affirm the district court's summary judgment decision denying qualified immunity. The district court "remains free to reconsider its qualified immunity question as the facts are developed and decided" in further proceedings, including trial, "[b]ut for now our obligation to view the facts in the light most favorable to Mr. [King] makes the entry of any final judgment [for Deputy Hill] impossible." *Blackmon v. Sutton*, 734 F.3d 1237, 1243 (10th Cir. 2013).

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge