**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 28, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JO KATHRYN REAVIS, administrator of
the estate of James Carl Coale, deceased,

     Plaintiff - Appellee,

v.

BLAKE FROST, individually,

     Defendant - Appellant,

and

DERRELL SUMMERS, individually;
OKFUSKEE COUNTY SHERIFF, in his
official capacity,

     Defendants.

No. 19-7042

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:17-CV-00138-SPS)**
_____

Randall J. Wood (Robert S. Lafferrandre, Jessica L. Dark, and Charles A. Schreck, with
him on the briefs), Pierce Couch Hendrickson Baysinger & Green, L.L.P., Oklahoma
City, Oklahoma, for Defendant-Appellant.

Andrew M. Casey, Foshee & Yaffe, Oklahoma City, Oklahoma (Carla R. Stinnett,
Stinnett Law, Sapulpa, Oklahoma, with him on the brief), for Plaintiff-Appellee.
_____

Before **BRISCOE**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.

_____

This appeal involves a police traffic stop that ended with the tragic death of the motorist. On November 5, 2016, Okfuskee County Sheriff Deputy Blake Frost shot and killed James Carl Coale, as Mr. Coale was fleeing in his truck from a roadside police stop. Mr. Coale's estate sued Deputy Frost, alleging the use of excessive force in violation of Mr. Coale's Fourth Amendment rights. The district court denied Deputy Frost's motion for summary judgment that was based on qualified immunity. Because it was clearly established that Deputy Frost's use of deadly force to stop Mr. Coale's fleeing vehicle was objectively unreasonable, we affirm.

## I. BACKGROUND

### A. *Factual History*[1]

Deputy Blake Frost and Deputy Zachary Scribner, deputies with the Okfuskee County Sheriff's Department, responded to the report of a stabbing incident on November 5, 2016. They went to the Creek Nation Emergency Room in Okemah, Oklahoma, where the stabbing victim identified his assailant as Josh Williams. According to the victim, Mr. Williams fled the scene of the stabbing in a large, black 1990s model

---

[1] This factual history is drawn from the district court's recitation of the undisputed facts, because our interlocutory review of an order denying qualified immunity is limited to issues of law. *See Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985).

Chevrolet truck with a loud exhaust. The victim further stated that the truck was towing a trailer and that Mr. Williams had a toddler with him in the vehicle.

After taking the stabbing victim's report, Deputy Frost and Deputy Scribner employed their separate police vehicles to locate Mr. Williams. At County Road 3750, the two split up, with Deputy Frost driving north and Deputy Scribner driving south.

While proceeding north, Deputy Frost drove past a dark-colored Chevrolet truck, no trailer attached, as it was backing out of a driveway attached to a house. After Deputy Frost passed the vehicle, its reverse lights went off and the truck pulled forward in a semi-circle through the front yard of the house and proceeded south on CR 3750—the same direction as Deputy Scribner and away from Deputy Frost. None of these actions constituted a traffic violation.

Deputy Frost radioed Deputy Scribner and reported he believed he had found the suspect, Mr. Williams. Deputy Scribner then turned around and began driving north while Deputy Frost turned around and began driving south, both pursuing the dark-colored truck. Unbeknown to the deputies, James Coale was driving the truck—not the suspect, Mr. Williams.

After Deputy Frost began following the truck, Mr. Coale made a U-turn. Mr. Coale was now driving north in front of Deputy Scribner, while Deputy Frost was driving south toward Mr. Coale and Deputy Scribner. At some point during the pursuit, Deputy Frost activated his emergency lights.

While still driving southbound, Deputy Frost changed lanes and stopped his vehicle in the northbound lane, directly in the path of Mr. Coale. Mr. Coale stopped his

3

truck about one and a half to two car lengths away from Deputy Frost in the same northbound lane, with the vehicles facing each other. Deputy Frost exited his vehicle and walked behind it so he could approach Mr. Coale from the passenger side. This resulted in Deputy Frost standing in the middle of the road. According to Deputy Frost, he did so to improve his "tactical position" and to get a better line of sight because Mr. Coale's truck headlights were in his eyes.

Deputy Frost testified that he identified himself as with the Sheriff's office and repeatedly commanded Mr. Coale to show his hands. Deputy Frost had his gun flat against his chest in the "ready" position as he spoke to Mr. Coale. Deputy Frost did not check whether anyone else was in Mr. Coale's vehicle at that time. When Mr. Coale did not show his hands, Deputy Frost pointed his gun at Mr. Coale.

Mr. Coale accelerated his truck forward and toward Deputy Frost. Deputy Frost moved closer to his own vehicle and Mr. Coale's truck went around Deputy Frost and the police truck, passing within inches of Deputy Frost. About the time Mr. Coale's side mirror passed Deputy Frost, he raised his gun to fire at Mr. Coale. Deputy Frost fired five to seven times as the vehicle passed. The district court determined that "all of the bullets were [fired] behind and to the side of Mr. Coale." App., Vol. I at 323. A sketch of Mr. Coale's truck and the bullet trajectories strongly supports this finding.[2]

---

[2] The bullet trajectory diagram was filed in the proceedings below and on appeal under seal pursuant to Oklahoma Statute title 74, § 150.5 ("All records relating to any investigation being conducted by the Bureau . . . shall be confidential and shall not be open to the public . . . ."). Although sealed, the diagram is part of the record on appeal and was available to the district court. In deference to the State of Oklahoma, we do not unseal the diagram. But we consider it as supporting the factual

The bullet trajectory diagram shows the bullets entered Mr. Coale's truck through the rear window or next to the rear window on the passenger side. The district court's finding is also not surprising in light of how Deputy Frost described the sequence of events: "As he's passing by, I watch the front of the truck go by. The mirror comes, and I find sight picture on my firearm. [As] soon as I found sight picture, I squeezed." App., Vol. II at 370. Deputy Frost further testified:

Q. Where were you aiming?

A. For the driver.

Q. Was this through the back window?

A. That was as soon as I gained sight picture to initiate, yes.

App., Vol. II at 371.

The vehicle continued a short way down the road and then ran into a ditch. Deputy Frost went to his vehicle to report that shots had been fired. Deputy Scribner arrived while Deputy Frost was on his car radio reporting the incident. Intending to make an arrest, Deputy Scribner advanced on Mr. Coale's vehicle. But Mr. Coale was unresponsive. Deputy Scribner, who had encountered Mr. Williams before, knew that Mr. Coale was not the stabbing suspect. He informed Deputy Frost of that fact.

---

basis for our legal review. And ultimately, the district court found—as the diagram reflects—that all the bullets came from the back and side of Mr. Coale's truck. Rather than, as the dissent suggests, improperly supplementing the district court's factual findings, Dissent at 14–15, we mention the diagram, and Deputy Frost's testimony, merely to note that the district court's expressed factual finding is supported by the record.

Neither deputy attempted to render aid to Mr. Coale, but Deputy Scribner called Emergency Medical Services. While the two deputies were waiting for others to arrive, Deputy Frost told Deputy Scribner that Mr. Coale had tried to run him over. Deputy Frost made no other statements, handed over his service weapon when it was requested, and was taken to the police station. Subsequent examination concluded that Mr. Coale died from a gunshot wound to the back of the head.

## B. *Procedural History*

On April 12, 2017, Jo Kathryn Reavis, the administrator of Mr. Coale's estate (the Estate), filed a Complaint alleging two claims against Deputy Frost. First, the Estate brought a claim under 42 U.S.C. § 1983, alleging Deputy Frost violated Mr. Coale's Fourth Amendment rights by using excessive force. Second, the Estate brought a wrongful death claim pursuant to Oklahoma Statute Title 12, § 1053. Deputy Frost moved for summary judgment on both claims. With respect to the § 1983 claim, Deputy Frost asserted he is entitled to qualified immunity. The district court denied Deputy Frost's motion for summary judgment on the § 1983 claim. But the district court dismissed the Estate's wrongful death claim because the Estate conceded that Deputy Frost is not a proper party to that claim. Deputy Frost filed a timely appeal of the district court's denial of qualified immunity.

An order denying qualified immunity from suit, to the extent that it turns on an issue of law, is an immediately appealable decision under the collateral order doctrine and is a final decision under 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 525–30

6

(1985). We therefore have jurisdiction over the legal issues raised by Deputy Frost's appeal.

## II. DISCUSSION

"We review the denial of a summary judgment motion raising qualified immunity questions de novo." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1212 (10th Cir. 2019) (quotation marks omitted). However, "the appealable issue is a purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law." *Mitchell*, 472 U.S. at 528 n.9.

> [I]f a district court concludes a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own de novo review of the record might suggest otherwise as a matter of law.

*Lynch v. Barrett*, 703 F.3d 1153, 1159 (10th Cir. 2013) (quotation marks omitted); *see also Fancher v. Barrientos*, 723 F.3d 1191, 1199 (10th Cir. 2013) ("This court, however, lacks jurisdiction at this stage to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." (internal quotation marks omitted)).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Deputy Frost's "assertion of qualified immunity creates a presumption that [he is]

7

immune from suit." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). The Estate can overcome this presumption only by "show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right." *Id.* (quoting *Mullenix*, 136 S. Ct. at 308).

The district court denied Deputy Frost's motion for summary judgment based on qualified immunity. The district court concluded that a reasonable jury could find Deputy Frost's use of deadly force was objectively unreasonable under the circumstances and that this was clearly established under Tenth Circuit precedent. Deputy Frost challenges both conclusions on appeal.

### A. *Constitutional Violation*

The Estate alleges that Deputy Frost violated Mr. Coale's Fourth Amendment rights by using excessive force against him. Specifically, the Estate argues it was unreasonable for Deputy Frost to use deadly force to prevent Mr. Coale from fleeing.

"To state an excessive force claim under the Fourth Amendment, [the Estate] must show *both* that a seizure occurred and that the seizure was unreasonable." *Thomas v. Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010) (internal quotation marks omitted). "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Reasonableness is "judged from the perspective of a reasonable officer on the scene,

8

rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

"[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This is a "totality of the circumstances" analysis. *Garner*, 471 U.S. at 8–9. When considering "the facts and circumstances of each particular case," we specifically consider three factors outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989): (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

"The second *Graham* factor . . . is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). This is particularly true in a deadly force case, because "deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009). Some of the factors we consider when evaluating the degree of a threat include, "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest

9

intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). "The reasonableness of [the officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (footnote omitted).

"The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Garner*, 471 U.S. at 11.

> Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . .
>
>     . . . . Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.[3]

*Id.* at 11–12. Accordingly, an officer may use deadly force when "threatened by [a] weapon (which may include a vehicle attempting to run over an officer)." *Thomas*, 607 F.3d at 664. But "[w]hen an officer employs such a level of force that death is nearly

---

[3] On appeal, Deputy Frost argues only that a reasonable officer in his position would believe Mr. Coale posed a threat of serious physical harm to the officer, and that this immediate threat of physical harm permitted Deputy Frost to use deadly force. Deputy Frost does not advance any argument that he had probable cause to believe Mr. Coale was the perpetrator of the stabbing, and we do not consider that issue. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

10

certain, he must do so based on more than the general dangers posed by reckless driving."

*Cordova*, 569 F.3d at 1190.

The district court concluded that under the totality of the circumstances, a reasonable jury could find that Deputy Frost's use of deadly force was objectively unreasonable and thereby violated Mr. Coale's Fourth Amendment rights. In reaching that conclusion, the district court considered the *Graham* factors and determined that the first and third factors—the severity of the crime and whether the suspect is actively resisting arrest—both weighed in Deputy Frost's favor. App., Vol. I at 320 (finding the first factor weighed in Deputy Frost's favor "because Mr. Coale used his vehicle to evade arrest, which is a misdemeanor under Oklahoma law." (citing Okla. Stat. tit. 21, § 540A(A))); App., Vol. I at 321 ("The third factor, whether the suspect is actively resisting arrest, is likewise weighed in favor of Defendant Frost because Mr. Coale *was* evading the stop.").[4]

---

[4] The Estate argues the first *Graham* factor—the severity of the crime—weighs in its favor, but these arguments dispute the findings of the district court over which we lack jurisdiction. *See Fancher v. Barrientos*, 723 F.3d 1191, 1199 (10th Cir. 2013). The Estate also mischaracterizes the record and contends: "[T]he facts clearly show that [Deputy Frost's] perception at the time was that he was absolutely *not* apprehending a violent felon." Aple. Br. at 16 (citing App., Vol. I at 188–90). Deputy Frost testified, however, that although he did not know if the person in the truck was a dangerous criminal, he suspected the driver might be.

Relying on the district court's finding that Mr. Coale committed only a misdemeanor—using a vehicle to evade arrest—the Estate argues this is a nonviolent crime that cannot justify deadly force. Aple. Br. at 15–16 (citing *Estate of Ronquillo ex rel. Estate of Sanchez v. City & County of Denver*, 720 F. App'x 434, 438 (10th Cir. 2017) (unpublished) (weighing this factor in favor of the estate when the alleged crimes were nonviolent)). But Mr. Coale's attempt at evading arrest involved driving his truck, a dangerous weapon, at Officer Frost.

11

With respect to the second *Graham* factor—immediacy of the threat of harm—the district court considered the four factors bearing on that analysis outlined in *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008),[5] and concluded a reasonable jury could find that Deputy Frost's use of deadly force was objectively unreasonable under the totality of the circumstances:

> Here, Defendant Frost ordered Mr. Coale to show his hands, and Mr. Coale apparently did not. Furthermore, a vehicle may be considered a weapon. *Thomas*, 607 F.3d at 664 (The term "weapon" "may include a vehicle attempting to run over an officer."). And although it is unclear just how close the vehicle was to Defendant Frost when it passed him, the evidence indicates that it was very close and possibly within inches of him, and Defendant Frost testified that he had to move out of the way of the truck. As to the fourth factor, there is no evidence regarding Mr. Coale's intentions. *Although several of these factors weigh in favor of Defendant Frost, the totality of circumstances nevertheless do not support his use of deadly force "at the precise moment that [he] used force." Estate of Ronquillo* [*ex rel. Estate of Sanchez v. City & County of Denver*, 720 F. App'x 434, 438 (10th Cir. 2017) (unpublished)]. Defendant Frost had his weapon out and "ready" as he circled around his vehicle and up toward Mr. Coale's vehicle (which was at least one and a half car lengths away from his) and moved or jumped out of the way of Mr. Coale's vehicle when it started moving in his direction. When it had nearly passed him, *and only then*, did he fire at Mr. Coale from behind and to the side. But "[w]hen an officer employs such a level of force that death is nearly certain, he must do so based on more than the general dangers posed by reckless driving." *Cordova*, 569 F.3d at 1190. *Here, there was no immediate danger to other officers or civilians and the only risk at the moment the gun was fired was that created by Mr. Coale fleeing from the stop.* As the Tenth Circuit has stated before, the Court "cannot say [] that the general risks created by a motorist's fleeing from the police are, without more, enough to justify a shooting that is nearly certain to cause that suspect's death." *Cordova*, 569

---

[5] The Estate attempts to distinguish *Estate of Larsen* and to refute the utility of the factors we adopted there on the grounds that case involved a "split second judgment." Aple. Br. at 17–18. It is debatable whether there is any meaningful difference between the two cases for our purposes. And the *Estate of Larsen* factors may be properly considered as part of the totality of the circumstances even if the cases are factually dissimilar.

12

F.3d at 1189–1190 ("As *Scott* [*v. Harris*, 550 U.S. 372 (2007)] makes clear, however, the term ['deadly force'] encompasses a range of applications of force, some more certain to cause death than others. It includes force that is 'likely' to cause serious injury or death, such as ramming, and also includes force that is nearly certain to cause death, such as a shot to the head. *Scott* strongly suggests that the reasonableness balancing must take into account that there is a spectrum of 'deadly force,' and that just because a situation justifies ramming does not mean it will justify shooting a suspect in the head."). Accordingly, a jury could conclude that Defendant Frost's actions were not objectively reasonable.

App., Vol. I at 322–23 (first, third, fourth, fifth, and sixth alterations in original and first and third emphases added).

Deputy Frost contends the district court erred when it concluded his actions were objectively unreasonable. The crux of his argument is that the district court incorrectly concluded Mr. Coale posed no immediate danger to anyone at the time Deputy Frost fired his weapon:

Reasonably fearing that the truck would strike and kill him, *Frost jumped out of the way and fired at the driver. Deputy Frost used force to stop an immediate threat.* Under the totality of the circumstances, Frost reasonably believed his life was in danger when Coale drove toward him in a pickup truck. *It was reasonable for Deputy Frost to believe the threat presented by this truck was immediate and injury imminent and decide to fire his weapon at that moment.* This force was objectively reasonable, and the District Court was incorrect to find an underlying constitutional violation on its way to denying qualified immunity.

Aplt. Br. at 20 (emphasis added); s*ee also* Aplt. Br. at 9 ("No reasonable jury could find that a threat to an officer had stopped while a truck was still speeding past that officer when the decision to shoot was made at the time the truck was coming directly toward the officer."). Deputy Frost concedes, as he must, that "the District Court *found* no threat at the moment Deputy Frost used force." Aplt. Br. at 21 (emphasis added). But he contends

13

that "this is an 'excessively technical dissection' of the threat presented to Deputy Frost" that fails to "see the 'whole picture[.]'" Aplt. Br. at 21 (alteration in original) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018)).

We lack jurisdiction to review Deputy Frost's challenge to the facts the district court relied on to conclude that a reasonable jury could find Mr. Coale posed no immediate danger to anyone at the time Deputy Frost fired his weapon. *See Fancher*, 723 F.3d at 1199; *Lynch*, 703 F.3d at 1159. And, while we may review Deputy Frost's argument that the district court committed a legal error by conducting an overly technical analysis of the facts, that claim is meritless.

The district court applied the correct legal framework in reaching its decision to deny Deputy Frost's claim to qualified immunity on summary judgment. The district court evaluated the seriousness and immediacy of the threat facing Deputy Frost using the factors from *Estate of Larsen*. The Supreme Court has instructed that deadly force is unreasonable when "the suspect poses no *immediate threat to the officer* and no threat to others." *Garner*, 471 U.S. at 11 (emphasis added); *see also, Sevier*, 60 F.3d at 699 ("The reasonableness of Defendants' actions depends . . . on whether the officers were in danger at the precise moment that they used force . . . .").[6]

---

[6] The dissent asserts, "That this court would focus on the 'precise moment' of the shooting to deny immunity would not necessarily have been clear under our case law to every reasonable officer." Dissent at 10. But as the dissent notes, the "'precise moment' principle" has a long history and is frequently cited in our qualified immunity decisions. Dissent at 11 n.3. Our decision in *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995), put officers on notice that we will consider whether the officers were in danger at the moment they used force when determining whether the use of deadly force was reasonable under the totality of the circumstances.

14

In evaluating whether the suspect poses an immediate threat when deadly force is employed, the court must consider the totality of the circumstances. That is, the question of whether there is no threat, an immediate deadly threat, or that the threat has passed, at the time deadly force is employed must be evaluated based on what a reasonable officer would have perceived under the totality of the circumstances.

Recently, in *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020), we reviewed the district court's grant of qualified immunity under circumstances instructive of the issue here. In *Smart*, we reasoned that several facts, taken in the light most favorable to the plaintiffs, could enable a reasonable jury to conclude that the defendant police officer, "had the opportunity to perceive that any threat [posed by Mr. Smart] had passed by the time [the officer] fired his final shots":

> The plaintiffs' biomechanics expert opined Mr. Smart's bullet wounds could not have been inflicted while he was hunched forward as Officers Froese and Chaffee described Mr. Smart's posture when fleeing. Also, the plaintiffs' medical expert explained that Mr. Smart's three "shored" bullet wounds indicated he had been shot three times in the back, while on the ground. From this evidence, a reasonable jury could conclude that by the time Officer Chaffee fired his final shots, Mr. Smart was lying face down on the ground with his arms stretched out, was unarmed, and had time to "look[] back" at Officer Chaffee and shake his head.

*Id.* at 1175 (citation omitted). There, we reversed the district court's grant of qualified immunity with respect to the final shots because "Officer Chaffee violated clearly established law if he shot Mr. Smart after it would have been clear to a reasonable officer that the perceived threat had passed." *Id.* at 1176.

Likewise, in *Fancher v. Barrientos*, 723 F.3d 1191 (10th Cir. 2013), we affirmed the district court's denial of qualified immunity as to an officer's final shots

15

because under the totality of the circumstances the officer lacked probable cause to believe the suspect posed a threat when the officer fired those shots. *Id.* at 1201. We explained,

> According to the factual scenario upon which the district court based its rejection of [Deputy] Barrientos's claim to qualified immunity, which this court lacks the authority to review, [Deputy] Barrientos fired six shots into a suspect who was "no longer able to control the vehicle, to escape, or to fire a long gun, and thus, may no longer have presented a danger to the public, Deputy Barrientos, or other responding officers." Mem. Op. & Order at 30. Prior to shooting [Mr.] Dominguez, [Deputy] Barrientos "stepped back, felt safer, and noticed Mr. Dominguez slump." *Id.* This allowed him "enough time . . . to recognize and react to the changed circumstances and cease firing his gun." *Id.* Under these circumstances, we have no trouble concluding [Deputy] Barrientos lacked probable cause to believe [Mr.] Dominguez posed a threat of serious harm to [Deputy] Barrientos or others at the time he fired shots two through seven.

*Id.* (omission in original). This rationale clearly places officers on notice that the use of deadly force is unreasonable when a reasonable officer would have perceived that the threat had passed. *See id.* It also demonstrates that considering the precise moment the officer used force is important because "circumstances may change within seconds[,] eliminating the justification for deadly force." *Id.* at 1200 (quotation marks omitted).

Here, the district court properly assessed whether a jury could conclude Deputy Frost was no longer in danger when he fired shots into Mr. Coale's fleeing truck. While the district court focused its analysis on whether Deputy Frost was in danger at the precise moment that he used force against Mr. Coale, it did so in the context

16

of the totality of the circumstances.[7] The district court considered the events leading up to

the shooting and found that Deputy Frost had "moved or jumped out of the way of Mr.

Coale's vehicle when it started moving in his direction." App., Vol. I at 322. And

"Defendant Frost did not fire his weapon until the front of the vehicle and Mr. Coale

himself had passed him – all of the bullets were behind and to the side of Mr. Coale."

App., Vol. I at 323; *see also* App., Vol. I at 322 ("When it had nearly passed him, *and*

*only then*, did he fire at Mr. Coale from behind and to the side."). The district court also

---

[7] The dissent contends the district court's analysis failed to consider the totality of the circumstances and improperly focused on the "precise moment" factor. Dissent at 10–14. For support, the dissent relies on two cases with underlying facts that make their totality of the circumstances analyses inapposite to the case at bar.

In *Thomson v. Salt Lake County*, 584 F.3d 1304, 1318–19 (10th Cir. 2009), and *Phillips v. James*, 422 F.3d 1075, 1083–84 (10th Cir. 2005), officers shot suspects who were armed, did not comply with orders to put down their firearms, and who repeatedly threatened to shoot the responding officers. At the precise moment the officer fired, the suspect in *Thomson* was aiming the weapon at his own head. *Thomson*, 584 F.3d at 1318. A few seconds prior, the suspect had pointed his gun at the officers. *Id.* at 1319. It is unclear what the suspect in *Phillips* was doing with his firearms inside his home at the moment the officer fired, but immediately prior to that moment, the suspect had propped open a window, knocked the screen out, and yelled that he had a clean shot at the officers in his yard. *Phillips*, 422 F.3d at 1084. In each case, we reasoned that the conduct leading up to the shooting gave the officers probable cause to believe they faced an immediate threat of serious bodily harm from the armed suspects, and we therefore concluded the officers' use of force was reasonable. *Thomson*, 584 F.3d at 1318; *Phillips*, 422 F.3d at 1084.

Unlike the firearms in *Thomson* and *Phillips* that posed a continuing threat to the officers during the encounters, Mr. Coale's vehicle posed a threat only when it was moving toward Deputy Frost. And in contrast to the conduct leading up to the shootings in *Thomson* and *Phillips*, the conduct leading up to the shooting in this case—the front of Mr. Coale's vehicle passing without hitting Deputy Frost— eliminated any probable cause that Deputy Frost had to believe he faced a threat of serious bodily harm. The totality of the circumstances in this case are that Mr. Coale drove toward Deputy Frost, Deputy Frost moved out of the way, the vehicle passed without hitting Deputy Frost, and Deputy Frost then shot five to seven bullets through the side and rear window of the vehicle, killing Mr. Coale.

found that Deputy Frost and Mr. Coale "were essentially alone on a dirt road, meaning that there were no other officers or bystanders to be concerned about the vehicle's path." App., Vol. I at 323. Taking all of these facts into consideration, the district court concluded that a reasonable jury could find that "there was no immediate danger to other officers or civilians and the only risk at the moment the gun was fired was that created by Mr. Coale fleeing from the stop." App., Vol. I at 322.

On these facts, and under the totality of the circumstances, the district court also properly rejected Deputy Frost's argument that he is entitled to qualified immunity as a matter of law because a reasonable officer in his position would have believed there was a threat of serious physical harm, even if there was no actual immediate threat when he pulled the trigger. The dissent contends, "Neither Frost nor a reasonable officer could be expected to figure out instantaneously the suspect's next moves when the suspect had just tried to run him over." Dissent at 14. But this contention ignores the facts found by the district court and the factual inferences that we must draw from those facts in favor of the Estate as the non-moving party. *See Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) ("When the defendant has moved for summary judgment based on qualified immunity, we still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor."). Importantly, Deputy Frost "moved or jumped out of the way of Mr. Coale's vehicle when it started moving in his direction," App., Vol. I at 322, and Deputy Frost raised his gun to fire "[a]bout the time [Mr. Coale's] side mirror passed by [him]." App., Vol. I at 314. From these facts, we conclude that a reasonable officer in

18

Deputy Frost's position would have perceived that Mr. Coale's vehicle had passed him, and he was no longer in any immediate danger from an oncoming vehicle when he raised his gun to fire. A reasonable officer in Deputy Frost's position would have also perceived that Mr. Coale's vehicle did not pose any immediate danger to anyone else as they were alone on a dirt road. Given that all the shots Deputy Frost fired were "from behind and to the side" of Mr. Coale's vehicle, App., Vol. I at 322, we further conclude that even in the short time it took Deputy Frost to raise his weapon and line up his shot, a reasonable officer would have perceived he was shooting at the back and side of a fleeing—not an oncoming—vehicle. *See Cordova*, 569 F.3d at 1187 (reasoning that "[t]he fatal shot . . . enter[ing] the truck from the side and [going] through the back of [the driver's] head . . . strongly suggests that [the driver] had turned the truck and was no longer bearing down upon [the officer] at the moment the officer fired the fatal shot"). Thus, a reasonable officer in Deputy Frost's position would have known when he raised his weapon and fired that there was no immediate threat of harm to himself or others such that "the general dangers posed by [Mr. Coale's] reckless driving" were insufficient to justify the use of deadly force. *Id.* at 1190.

Nonetheless, Deputy Frost contends he is entitled to qualified immunity under our decision in *Clark v. Bowcutt*, 675 F. App'x 799 (10th Cir. 2017) (unpublished). But *Clark* is easily distinguished. There, the officer was standing directly in front of an oncoming vehicle. *Id.* at 808. Rather than move out of the way, the officer stood his ground and shot the driver through the vehicle's windshield. *Id.* at 801. We held the officer's use of force was objectively reasonable because the officer was standing directly in the path of the

19

oncoming car, inches from its bumper, when he used force to avoid being hit. *Id.* at 801, 808. In contrast, Deputy Frost's use of force was not to avoid being hit by Mr. Coale; the district court found that Deputy Frost had moved out of the truck's path and the vehicle had passed when Deputy Frost fired at the back and side of the truck, killing Mr. Coale.

The other decisions Deputy Frost cites are similarly inapposite because the officers in those cases were in the path of an oncoming vehicle when they used deadly force. *Carabajal v. City of Cheyenne*, 847 F.3d 1203 (10th Cir. 2017) (concluding the officer reasonably perceived a threat of imminent harm when that officer was standing directly in the path of an oncoming vehicle and shot the driver); *Estate of Ronquillo*, 720 F. App'x 434 (concluding the officers reasonably perceived a threat of imminent harm when they opened fire on a vehicle that accelerated forward toward multiple officers). And in *Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010), an officer was struck by a fleeing vehicle, hit the ground, and came up firing. Although we determined the danger had passed when the shots were fired at the fleeing vehicle, we concluded the officer's misperception was reasonable in light of the totality of the circumstances—having just been hit by the car. *Id.* at 666. In contrast, here, Deputy Frost had successfully moved out of the path of Mr. Coale's truck and used deadly force after the vehicle had passed him. And Mr. Coale's fleeing vehicle did not pose an immediate threat to any third parties.

In sum, on the facts that the jury could find, an objectively reasonable officer would not have feared for his life when Deputy Frost fired at Mr. Coale, the district court correctly denied summary judgment on whether Deputy Frost violated Mr. Coale's

20

Fourth Amendment right to be free from excessive force. *See Cordova*, 569 F.3d at 1190–92.

**B.** *Clearly Established*

The Estate must also demonstrate that the constitutional right "was clearly established at the time [Deputy Frost shot Mr. Coale], such that 'every reasonable official would have understood' that such conduct constituted a violation of that right." *Perea*, 817 F.3d at 1202 (quoting *Mullenix*, 136 S. Ct. at 308). "In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009). Resolving this prong of qualified immunity requires "a purely legal determination." *Fancher*, 723 F.3d at 1200. "[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quotation marks omitted), *cert. denied*, 139 S. Ct. 1347 (2019). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* (alteration in

21

original) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Consequently, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id.* (alteration in original) (quoting *al-Kidd*, 563 U.S. at 742).

"Nevertheless, our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Estate of Smart*, 951 F.3d at 1168 (internal citations and quotation marks omitted). "'[G]eneral statements of the law' can clearly establish a right for qualified immunity purposes if they apply 'with obvious clarity to the specific conduct in question.'" *Halley*, 902 F.3d at 1149 (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (alterations in original) (quoting *Hope*, 536 U.S. at 741).

It is clearly established that an officer may use deadly force when "threatened by a weapon (which may include a vehicle attempting to run over an officer)." *Thomas*, 607 F.3d at 664. And our decisions have held that an officer's use of deadly force is objectively reasonable when the officer shoots at a vehicle coming directly toward the officer or toward other persons. *Carabajal*, 847 F.3d at 1206; *Thomas*, 607 F.3d at 661, 664–66. But these cases do not answer the question before us— whether it is objectively reasonable for an officer to use deadly force to stop a fleeing

22

vehicle when an objectively reasonable officer in Deputy Frost's position could have perceived that any threat posed by Mr. Coale's truck had abated before he fired.

To answer that question, we turn to the Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1 (1985), which addressed a Tennessee statute permitting an officer to "use all the necessary means to effect the arrest" of a fleeing suspect. *Id.* at 4 (quoting Tenn. Code Ann. § 40-7-108 (1982)). *Garner* clearly established that when a "suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11. In other words, it is clearly established that an officer cannot use deadly force once a threat has abated. *See id.*; *see also Fancher*, 723 F.3d at 1201 (applying the clearly established principle that an officer may not use deadly force once the officer can perceive that a suspect no longer poses a threat to himself or others).

In *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009), we applied this general principle from *Garner* to a factually similar § 1983 case. The district court granted the officer's motion for summary judgment based on qualified immunity, concluding that the officer's actions "did not constitute excessive force." *Id.* at 1185–86. On appeal, we "disagree[d] that the facts could not constitute a constitutional violation," but affirmed "on the grounds that the law was not clearly established." *Id.* at 1186.

The officer in *Cordova* "claim[ed] that he was in immediate danger, about to be run over, and therefore rapidly fired at the vehicle while simultaneously trying to move out of the way." *Id.* at 1187. One of the shots hit and killed the driver of the

23

vehicle. *Id.* But it was unclear whether the officer was actually in immediate danger at the time he fired. *Id.* "The fatal shot, in fact, entered the truck from the side and went through the back of [the driver's] head. This strongly suggests that [the driver] had turned the truck and was no longer bearing down upon [the officer] at the moment the officer fired the fatal shot." *Id.*

The officer did not challenge "the district court's findings that a reasonable juror could find that [the officer] was not in immediate danger at the time of the shooting." *Id.* at 1187–88. And so, our analysis focused on "whether the potential risk to third parties created by [the vehicle] was alone sufficient to justify [the officer's] shooting [the driver]." *Id.* at 1188. We held that it was not, explaining that "[w]hen an officer employs such a level of force that death is nearly certain, he must do so based on more than the general dangers posed by reckless driving." *Id.* at 1190. As we further explained:

> The threat to the officers themselves—if actual and imminent—could of course shift the calculus in the direction of reasonableness. If a reasonable officer in [the shooting officer's] position would have feared for his life or the life of his fellow officers, then on one side of the scales would sit not only the potential (even if distant) risk to any motorist who might wander along, but also the very immediate risk of death to the pursuing officers. The urgency of terminating the chase would increase and the balance would tip in the officers' favor. The use of deadly force—even of the level nearly certain to cause death—would likely be justified. Here, however, the threat to the officers is a disputed fact, and for purposes of the summary judgment motion the district court explicitly assumed the officers to be in no immediate danger.

*Id.*

As in *Cordova*, our analysis relies in part on the district court's conclusion that a reasonable jury could find that Mr. Coale's fleeing vehicle did not pose any immediate danger to Deputy Frost or others at the time of the shooting. So from *Cordova*'s application of *Garner*'s general principle to facts similar to those here, it was clearly established at the time Deputy Frost shot and killed Mr. Coale that when an officer uses deadly force to stop a fleeing vehicle, he must do so based on an immediate threat to himself or a threat to others. And use of deadly force is clearly unreasonable when (1) the only threat is one posed by reckless driving and (2) the immediacy of the threat to the officer is a disputed fact that a reasonable jury could resolve against the officer. *Id.* at 1186 ("We disagree [with the district court] that the facts could not constitute a constitutional violation. We affirm the grant of summary judgment to Officer Aragon, however, on the grounds that the law was not clearly established . . . .").

The core of Deputy Frost's argument on the clearly established prong of qualified immunity is that "it was not obvious to a reasonable officer that he was violating the Fourth Amendment by firing a weapon at a suspect that posed an immediate and serious risk of harm by attempting to evade and then strike him with a pickup truck." Aplt. Br. at 7. But Deputy Frost's argument conflates the clearly established prong of qualified immunity with the constitutional violation prong by contending that the facts of this case

25

make it a "close call" whether he reasonably perceived an immediate threat when he fired at Mr. Coale's truck.[8] Aplt. Br. at 14.

> Under the District Court's framing, it would have been reasonable for Deputy Frost to shoot at [Mr.] Coale as he drove the truck "toward" him, but not one moment after. From that, it should be obvious that the question of whether the threat had abated is a gray area or debatable.

Aplt. Br. at 14 (citation omitted). The dissent's rationale accepts Deputy Frost's argument. *See, e.g.*, Dissent at 9–10, 14.

This argument is unpersuasive because it frames the alleged constitutional violation as his use of deadly force when it was not yet clear the threat had abated. This argument not only misstates the alleged constitutional violation by failing to take the facts in the light most favorable to the Estate, it is also premised on an impermissible challenge to the district court's factual findings. The district court

---

[8] Deputy Frost notes a couple of "facts" that he claims are "undisputed." Aplt. Br. at 13–14, 16. But these "facts" mischaracterize the district court's findings. Deputy Frost reframes the finding that he started firing as the pickup truck passed him, or when it had nearly passed him, as indicating "that [Mr.] Coale's pickup truck presented a clear and continuing danger to Deputy Frost at the moment he fired his weapon." Aplt. Br. at 13–14. Deputy Frost also claims, without any citation, that "the undisputed fact is—as determined by the District Court—that Deputy Frost did not have time to collect himself before or during [the] shooting." Aplt. Br. at 16. This "undisputed fact" is nowhere in the district court's order. Frost further argues that "it is also undisputed . . . that Frost started firing *as the pickup truck was speeding by him*." Aplt. Br. at 13. But the district court did not make any findings as to the speed of the truck. At most, the district court found that Mr. Coale "accelerated his truck forward and toward [Deputy] Frost." App., Vol. I at 314. And at the time Mr. Coale "accelerated," his vehicle was stopped. *See* App., Vol. I at 313 (noting the vehicle was stopped). But the fact that Mr. Coale accelerated his car from a standstill does not mean that it was "speeding" by Deputy Frost when he discharged his weapon.

26

determined that a reasonable jury could find there was no immediate danger to Deputy Frost or others when he fired and Mr. Coale's fleeing vehicle. Construing the facts, as the district court found them, in the light most favorable to the Estate, we conclude that a reasonable officer in Deputy Frost's position would have known when he raised his weapon and fired that there was no immediate threat of harm to himself or others. Accordingly, the focus of our analysis here is whether it was clearly established that an officer may not use deadly force to stop a fleeing vehicle when a reasonable officer would have perceived he was in no immediate danger at the time he fired. Given our decision in *Cordova*, it would be clear to every officer that the use of deadly force to stop a fleeing vehicle is unreasonable unless there is an immediate threat of harm to himself or others. Thus, it would also be clear to every reasonable officer—who would have perceived any threat posed by Mr. Coale's truck had abated—that the use of deadly force to stop Mr. Coale's truck was unreasonable. Accordingly, the district court correctly concluded that Deputy Frost had fair notice that opening fire at a fleeing vehicle that no longer posed a threat to himself or others was unlawful.

## III.     CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's denial of summary judgment to Deputy Frost based on his assertion of qualified immunity.

27

No. 19-7042, *Reavis v. Frost*
**BRISCOE**, Circuit Judge, dissenting.

This case is indisputably tragic. Deputy Frost and Deputy Scribner went looking for a suspect in a stabbing. They saw a truck that partially matched a description of the vehicle of the alleged perpetrator. Frost encountered the truck first, stopped his patrol vehicle in the truck's path, and stood between the two vehicles with his gun drawn. Only two car lengths separated Frost from the truck. The driver ignored Frost's repeated commands to show his hands. After initially coming to a halt, the truck accelerated toward and past Frost. Frost began shooting as the truck's side mirror passed within inches of him. A bullet from Frost's gun fatally struck the truck's driver in the back of the head. We know now that Coale, the driver, had nothing to do with the stabbing.

The majority concludes that the district court correctly denied Frost's motion for summary judgment based on qualified immunity. I assume without deciding that Frost's actions (under the version of the facts a reasonable jury could find when read in the light most favorable to Coale) violated the Fourth Amendment. After careful review of applicable precedent, however, I cannot agree that every reasonable officer in Frost's position would have known that the law governing those actions was clearly established. This is especially true given recent Supreme Court rulings which have emphasized that "clearly established law" requires prior precedent which "squarely addresses" the specific circumstances confronting officers when they deploy force. Here, taking into account ambiguities in our case law, not every reasonable officer standing in Frost's shoes would have known it was illegal to fire as Coale's truck pulled close to him and passed.

"Our review of summary judgment orders in the qualified immunity context differs from that applicable to review of other summary judgment orders." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). When a defendant asserts qualified immunity in this procedural posture, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Pauly v. White*, 874 F.3d 1197, 1214 (10th Cir. 2017) (citation omitted). This burden is "heavy." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (citation omitted). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Id.* (citation omitted).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation and internal quotation marks omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (citation and internal quotation marks omitted). Although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation omitted). The Supreme Court calls this an "exacting" standard, *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774

2

(2015), giving officers "breathing room" to make reasonable but mistaken judgments when the law is uncertain. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).[1]

The district court carefully articulated facts that a reasonable jury could find in this case. Among those assumed facts are that (1) right before the encounter, Coale was driving toward Frost and being tailed by Scribner; (2) Frost activated the emergency lights of his patrol vehicle; (3) Coale stopped his truck "about one and a half to two car lengths away" from Frost; (4) Frost stood in the middle of the road between his patrol car and the truck, initially with his gun against his chest; (5) Frost "identified that he was with the Sheriff's office" and "repeatedly commanded the suspect to show his hands;" (6) Coale did not show his hands, prompting Frost to point his gun at Coale; (7) Coale accelerated his truck "forward and toward" Frost; (8) as Frost attempted to move closer to his car, Coale passed "very close" and "possibly within inches;" (9) Frost raised his gun to fire around the time Coale's side mirror went by, releasing a volley of shots "to the side" and from behind the truck; and (10) as Scribner arrived on the scene, Frost said Coale had tried to run him over. Aplt. App., Vol. 1 at 313–15, 322–23. For three

---

[1] Similarly, when evaluating the constitutionality of the use of force, the Supreme Court has indicated that an officer's alleged actions cannot be viewed with perfect retrospection. "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others." *City & Cty. of San Francisco*, 135 S. Ct. at 1775 (citation and internal quotation marks omitted). "This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes." *Id.* (citation and internal quotation marks omitted). For instance, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back," then "the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled in part on other grounds*, *Pearson v. Callahan*, 555 U.S. 223, 231–43 (2009).

reasons, I do not believe that every reasonable officer in this described scenario would have known that firing as Coale drew near him and passed by was illegal.

First, the Supreme Court has time and again declared in Fourth Amendment cases that there must be a close fit between prior precedent and the specific circumstances giving rise to the use of force. The Supreme Court has "repeatedly" told us "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (citation omitted, emphasis in original). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (citation and internal quotation marks omitted). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152–53 (citation omitted); *see also City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (confirming that defining the clearly established right with specificity is "particularly important in excessive force cases"). Police officers are thus entitled to qualified immunity in excessive force disputes "unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (citation omitted); *see also Mullenix*, 136 S. Ct. at 312 (stating that qualified immunity "protects actions in the hazy border between excessive and acceptable force") (citation and internal quotation marks omitted).

4

The majority places a significant amount of weight on *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), citing the case for the proposition that "when a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Maj. Op. at 23 (internal quotation marks omitted); *accord id.* at 10, 14. But decisions like *Garner* "lay out excessive-force principles at only a general level." *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (concurring that precedents like *Garner* are "cast at a high level of generality") (citation omitted). Stated differently, when an excessive force claim is in play, cases like *Garner* "do not by themselves create clearly established law outside 'an obvious case.'" *White*, 137 S. Ct. at 552 (citation omitted); *see also Kisela*, 138 S. Ct. at 1153 (same). As we remarked in *Estate of Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020), "the Supreme Court has repeatedly chastised courts for relying in such a manner on its broad statement of the law in *Garner*." *Id.* at 1174.

We can presume that every reasonable officer is aware of general Fourth Amendment principles, but Supreme Court precedent requires at least one prior decision which "squarely governs" the facts at hand. The Supreme Court has upheld the application of immunity and concluded the law was not clearly established when an officer shot and killed a speeding, evasive, and potentially intoxicated driver who was moments away from encountering another officer, *Mullenix*, 136 S. Ct. at 306–07, 309–10; when officers fired 15 shots into a suspect's vehicle, including 12 shots when the suspect was attempting to get away, after a high-speed chase endangering those on the

5

road and contact with patrol vehicles which prompted the suspect to "thr[o]w the car into reverse in an attempt to escape," *Plumhoff*, 572 U.S. at 769–70, 776–77; and when an officer shot in the back a suspect who refused commands to exit a vehicle, struggled with the officer, and started to drive off. *Brosseau v. Haugen*, 543 U.S. 194, 196–97, 199–201 (2004).

*Mullenix* and *Brosseau* are particularly notable. In *Mullenix*, the Supreme Court rejected the Fifth Circuit's formulation of the immunity question as whether the defendant "violated the clearly established rule that a police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." 136 S. Ct. at 308–09 (citation and internal quotation marks omitted). The Court determined that "none of our precedents 'squarely governs' the facts here," precluding a finding that "only someone plainly incompetent or who knowingly violate[s] the law would have perceived a sufficient threat and acted" as the officer did. *Id.* at 309–10 (brackets in original, citation and internal quotation marks omitted). In *Brosseau*, the Court once more concluded that no prior case "squarely govern[ed]" the facts presented, reversing a denial of immunity where the officer "fired one shot through the rear driver's side window, at a forward angle, hitting [the suspect] in the back." 543 U.S. at 196–97, 201 (brackets added). The officer in *Brosseau* discharged her weapon because she feared for colleagues whom she "believed" were in the immediate area, and for other citizens who "might" be nearby. *Id.* at 197; *see also Plumhoff*, 572 U.S. at 780 ("In *Brosseau*, an officer on foot fired at a driver who had just begun to flee and who had not yet driven his car in a dangerous manner.").

6

In my view, the majority's analysis here is similar to the dissent's rationale in

*Kisela*. In a *per curiam* decision, seven Justices in *Kisela* held that an officer did not

violate "clearly established" law when he fired—less than one minute after spotting a

bystander potentially in harm's way—upon an erratic and non-compliant suspect

clutching a knife. 138 S. Ct. at 1150–53. The *Kisela* majority again stressed that existing

precedent must "squarely govern" the specific facts at issue in Fourth Amendment

disputes, and that "it does not suffice for a court to simply state that an officer may not

use unreasonable and excessive force, deny qualified immunity, and then remit the case

for a trial on the question of reasonableness." *Id.* at 1153 (citation omitted). Dissenting,

Justices Sotomayor and Ginsburg maintained that viewing the facts in the suspect's favor

meant "a jury could reasonably conclude" the suspect "presented no immediate or

objective threat" to the bystander or any officer. *Id.* at 1157.[2] That argument lost

decisively, so we are left with the *Kisela* majority's reasoning.

---

[2] Justices Sotomayor and Ginsburg highlighted evidence indicating that (1) the suspect "stopped about six feet" from the bystander, with the knife "down at her side with the blade pointed away;" (2) the suspect and the bystander "conversed with one another;" (3) the suspect appeared "composed and content," as opposed to angry; (4) the suspect never raised the knife or verbally threatened the bystander or the officers; (5) the bystander later confirmed she was never in fear and was "not the least bit threatened" by the suspect; (6) the officers did not see the suspect committing a crime; (7) the officers' commands to drop the knife were given "in quick succession" and may not have been heard or understood by the suspect; (8) the officers never verbally identified themselves as law enforcement; (9) the shooting officer did not wait for the suspect to respond to any rushed commands, instead firing four times; and (10) after falling to the ground, screaming and bleeding from her bullet wounds, the suspect looked at the officers and asked "Why'd you shoot me?" *Kisela*, 138 S. Ct. at 1155–56.

7

Second, the Tenth Circuit cases highlighted by the majority, while probative, do not "squarely govern" the situation Frost faced. One of the cases cited by the majority is *Fancher v. Barrientos*, 723 F.3d 1191 (10th Cir. 2013), where a suspect physically struggled with an officer, sought to take the officer's gun, and later attempted to commandeer the officer's patrol vehicle. *Id.* at 1195–96. There were two loaded long guns in the vehicle, including an AR-15 assault rifle. *Id.* at 1196. As the officer fought to reclaim the vehicle, the suspect pushed the officer's hand away from the keys and shifted the vehicle into reverse. *Id.* The officer fired, hitting the suspect in the chest. *Id.* The suspect slumped. *Id.* at 1196–97. The officer then fired more shots, with some of them occurring after he took two or three steps away from the vehicle. *Id.* at 1197. The officer participated in two sets of gunshots, with the second set coming approximately five to seven seconds after the first. *Id.* We said that a jury could find the officer fired all but the first shot after the suspect ceased to be a threat, as the suspect was "no longer able to control the vehicle, to escape, or to fire a long gun[.]" *Id.* at 1201 (citation omitted). We observed that a jury could determine the officer had enough time after the suspect slumped "to recognize and react to the changed circumstances and cease firing his gun." *Id.* (citation omitted).

There are enough differences between *Fancher* and the case before us to make *Fancher*'s application uncertain. The officer in *Fancher* fired additional shots after watching the suspect slump after being shot in the chest. Here, there is no indication that Frost shot after seeing Coale lose control of his truck or enter into a state of debilitation. The officer in *Fancher* fired two volleys of bullets, separated by at least five seconds, and

8

had time after the first shot to step away from the vehicle and react to changed conditions. Frost released a single volley, and had time only to step out of the way of Coale's oncoming truck before firing. *Cf. Plumhoff*, 572 U.S. at 777 ("This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated [the suspect] and had ended any threat of continued flight, or if [the suspect] had clearly given himself up. But that is not what happened.") (brackets added). Moreover, there are no presumed facts demonstrating that Frost had a meaningful opportunity to reassess the threat level between shots.

The majority also plausibly relies on *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009). We strongly suggested in that case that an officer who killed a motorist was not in any immediate danger because almost all of the officer's bullets hit the side of the vehicle, rather than the front. *Id.* at 1187, 1191. Yet we, the district court, and the parties all accepted for purposes of analysis that no officer or no bystander was immediately at risk of harm. *Id.* at 1187–88; *see also id.* at 1189 (framing the ultimate issue as whether a "substantial but not imminent risk imposed on innocent bystanders and police by a motorist's reckless driving justifies a reasonable officer to use a level of force that is nearly certain to cause the motorist's death"). Furthermore, we recognized in *Cordova* that if a reasonable officer "would have feared for his life," then the use of deadly force "would likely be justified." *Id.* at 1190. Although Frost may have been wrong in concluding Coale's truck still posed a threat as it pulled even with him and then drove past, "[a]n officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances." *Thomas v.*

9

*Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010). In any event, *Cordova* was decided before the Supreme Court issued a number of decisions clarifying the "clearly established" prong of the test for qualified immunity, including *Plumhoff*, 572 U.S. at 778–80; *City & Cty. of San Francisco*, 135 S. Ct. at 1774–78; *Mullenix*, 136 S. Ct. at 308–12; *White*, 137 S. Ct. at 551–53; *Kisela*, 138 S. Ct. at 1152–55; and *City of Escondido*, 139 S. Ct. at 503–04.

Third, even with *Fancher* and *Cordova*, other decisions by this court made it unclear what law would apply to a reasonable officer in Frost's predicament. The district court in this case concentrated on the exact timing of the shooting, determining that a reasonable jury could conclude "there was no immediate danger" to officers or civilians "at the moment the gun was fired." Aplt. App., Vol. 1 at 322. Citing cases like *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995), the district court italicized the words and emphasized the importance of the "precise moment" Frost discharged his weapon. Aplt. App., Vol. 1 at 319, 321. The majority picks up on this language too, invoking it at least four times. Maj. Op. at 10, 12, 14, 16. And while the majority attempts to nestle the district court's reasoning into the totality of the circumstances, the fact remains that the court "focused its analysis on whether Deputy Frost was in danger at the *precise moment* he used force against Mr. Coale[.]" *Id.* at 16 (emphasis added).

That this court would focus on the "precise moment" of the shooting to deny immunity would not necessarily have been clear under our case law to every reasonable officer. We have said that analyzing the precise moment of lethal force (and whether an officer recklessly created the need to use such force) is at most "a specific application

of"—not a substitute for—"the 'totality of the circumstances' approach inherent in the Fourth Amendment's reasonableness standard." *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (citation omitted);[3] *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) (adverting to "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"). As we explained in *Phillips* in concluding that an officer (Sergeant Adamson) acted reasonably when he fired on a suspect (Mr. Phillips):

> Plaintiffs' argument relies heavily on the "precise moment" factor. Specifically, plaintiffs argue that Sgt. Adamson was not in danger of serious bodily injury immediately prior to the time when he shot Mr. Phillips. Strict reliance on just one factor when the totality must be considered is inappropriate. In addition, although the precise moment before Sgt. Adamson shot is a critical factor, the events leading up to that moment are also extremely relevant. When considered in the totality of the circumstances, Sgt. Adamson's decision to shoot Mr. Phillips was not unreasonable.

422 F.3d at 1083 (citation omitted).

---

[3] Although the "precise moment" principle generally traces back to *Sevier*, the panel in that case ultimately dismissed the matter for lack of jurisdiction. 60 F.3d at 699, 701–02. We have continued to use the phrase in other decisions, often in the process of granting (rather than denying) immunity. *See, e.g., Estate of Ronquillo v. City & Cty. of Denver*, 720 F. App'x 434, 438–40 (10th Cir. 2017) (unpublished) (affirming a grant of qualified immunity); *Pauly*, 874 F.3d at 1219–20 (reversing a denial of qualified immunity); *Clark v. Bowcutt*, 675 F. App'x 799, 806–08 (10th Cir. 2017) (unpublished) (reversing a denial of qualified immunity); *Thomas*, 607 F.3d at 664–65 (reversing a denial of qualified immunity); *Thomson*, 584 F.3d at 1318 (affirming a grant of qualified immunity); *Phillips v. James*, 422 F.3d 1075, 1083–84 (10th Cir. 2005) (affirming a grant of qualified immunity); *Jiron*, 392 F.3d at 415 (affirming a grant of qualified immunity).

Our decision in *Thomson* is pertinent as well. There, officers confronted an armed suspect who had threatened both violence and suicide. 584 F.3d at 1309–11. As the officers approached, the suspect (in the midst of struggling with a police dog) refused commands to drop his weapon, was "moving the gun very quickly," and was pointing the gun toward his own head when an officer fired a fatal shot. *Id.* at 1311, 1318. The entire sequence took "as little as ten seconds." *Id.* at 1311. We rejected the plaintiff's argument that deadly force was unjustified the instant the officer fired. We reiterated that "the totality of the circumstances" is the "touchstone of the reasonableness inquiry," sometimes making strict reliance on a "precise moment" criterion inappropriate. *Id.* at 1318 (citation and internal quotation marks omitted). Although the suspect in *Thomson* was not aiming his rifle at officers at the moment he was killed, we ruled the episode was "exactly the type of tense, uncertain, and rapidly evolving situation that we do not like to second-guess using the 20/20 hindsight found in the comfort of a judge's chambers." *Id.* (citation and internal quotation marks omitted). The rationale in cases like *Thomson* and *Phillips* has only strengthened over time, as the Supreme Court has taken the position that officers must have "breathing room" to make reasonable but mistaken judgments. *E.g., al-Kidd*, 563 U.S. at 743.

Our decision in *Thomas* casts additional doubt on whether every reasonable officer in Frost's situation would have recognized that firing on Coale was illegal. *Thomas* involved two plainclothes agents and a state trooper who confronted a car with three occupants in a convenience store parking lot. 607 F.3d at 659–60. The occupants did not see the trooper right away, and thought that the approaching (and visibly armed) agents

12

intended to rob them. *Id.* at 660–61. The driver of the car attempted to leave the parking lot, maneuvering around the agents' vehicle and forcing one of the agents to get out of the way. *Id.* at 661. The other agent, in the path of the car, fired two shots at the driver. *Id.* The car then struck that agent, who rolled off the hood, landed on his feet, turned around, and fired two more shots at the back of the car. *Id.* The entire episode lasted less than 40 seconds. *Id.* at 660.

We held in *Thomas* that the agent who fired did not contravene the Fourth Amendment, and regardless, the alleged illegality of the agent's conduct would not have been clear to a reasonable officer. We noted that "[t]he use of deadly force is not unlawful if a reasonable officer would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Id.* at 664. We examined whether the agent "could have reasonably perceived he was in danger at the precise moment that he used force and whether his own reckless or deliberate conduct (as opposed to mere negligence) unreasonably created the need to use force." *Id.* We then agreed with the agent's argument that the third and fourth shots – which were fired two seconds after the first and second shots – were justified because the agent erroneously but understandably believed the car was still coming his way:

> We recognize that circumstances may change within seconds eliminating the justification for deadly force. But Agent Durastanti's misperception appears to be quite reasonable, given that the video indicates that he had just been struck by the Lincoln and spun around, notwithstanding that he landed on his feet. Given such a disorienting experience, he had no assurance that the threat posed by the Lincoln had passed; this was a split-second decision concerning the use of deadly force under hardly ideal circumstances. Even if Agent Durastanti was mistaken, it was a reasonable mistake.

13

*Id.* at 666 (citation omitted).

The case at hand presents a more difficult set of assumed facts, but there are sufficient similarities with *Thomas* to make it hard to say that every reasonable officer in Frost's position would have known to hold his fire. A nearly two-ton vehicle accelerated toward Frost. It missed him by a matter of inches. Unlike the agent in *Thomas*, Frost did not get off his first shot until he was at least side-by-side with Coale's truck, and the fatal bullet struck Coale in the back of the head. But even if Frost's mental and physical reflexes were not as good as the agent's, and even if Frost misperceived the threat he faced, his response when viewed in the context of these rapidly unfolding events did not violate clearly established law. Neither Frost nor a reasonable officer could be expected to figure out instantaneously the suspect's next moves when the suspect had just tried to run him over. True, Frost did not have a "disorienting" event like the agent in *Thomas*. Yet Frost, too, was forced to make a quick decision in tense and uncertain circumstances. The differences between *Thomas* and this case are ones of degree.

I close with two observations about the facts a reasonable jury could find in this case, which facts the majority frequently invokes to justify the denial of summary judgment. First, after alluding to the general rule that we must take as true the facts identified by the district court – "even if our own *de novo* review of the record might suggest otherwise as a matter of law," *Lewis v. Tripp*, 504 F.3d 1221, 1225 (10th Cir. 2010) – the majority then supplements those facts. For example, the majority discusses a bullet trajectory diagram and testimony from Frost, neither of which is referenced in the

14

district court's opinion. Maj. Op. at 4–5 & n.2. It is speculation whether the district court credited these materials when it determined how a reasonable jury could interpret the evidence, and the Supreme Court said in *Johnson v. Jones*, 515 U.S. 304 (1995), that an appellate court may ascertain what facts the district court "likely assumed" only when the trial judge does *not* "state those facts." *Id.* at 319; *see also Leatherwood v. Welker*, 757 F.3d 1115, 1119 (10th Cir. 2014) ("When the district court does not set forth with specificity the facts it relied on, we may look to the record to determine which facts the court likely assumed."). Our trial judge stated such facts. The majority lacks authority to enhance them. *See Pauly*, 874 F.3d at 1225 (Moritz, J., concurring) ("I question whether the facts the majority relies on in evaluating the constitutional question are part of 'the universe of facts' as the district court found it to exist, or whether instead the majority has gleaned at least some of those facts from its own independent review of the record.").

Second, while the majority acknowledges the importance of the totality of the circumstances, today's ruling essentially rests on a single presumed fact. Over and over, the majority touts the possibility that a jury could conclude there was no threat of harm to Frost at the moment he fired, as shown by (*inter alia*) the deadly bullet coming from the back. Maj. Op. at 4–5, 12–14, 16–21, 25–27. Under binding Supreme Court precedent, that analysis is far too cramped. All of the circumstances matter. *See, e.g., City of Escondido*, 139 S. Ct. at 503–04; *Kisela*, 138 S. Ct. at 1152–55; *White*, 137 S. Ct. at 551–53; *Mullenix*, 136 S. Ct. at 308–12; *City & Cty. of San Francisco*, 135 S. Ct. at 1774–78; *Plumhoff*, 572 U.S. at 778–80. And as summarized above, there are at least ten other facts demonstrating that even if Frost made a mistake, not every reasonable officer would

15

have known that our case law prohibited the use of his firearm in the specific circumstances he faced. Those facts come directly from the district court's opinion. Aplt. App., Vol. 1 at 313–15, 322–23.

In light of numerous excessive force cases from the Supreme Court which serve as our guide in addressing qualified immunity, I vote to reverse the denial of Frost's summary judgment motion. I therefore respectfully dissent.